839 A.2d 294

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Walter OGROD, Appellant.**

Supreme Court of Pennsylvania.

Argued May 16, 2002.

Decided Dec. 30, 2003.

414

422

426

428

J. Scott O'Keefe, Philadelphia, for Walter Ogrod.

Hugh J. Burns, Philadelphia, Lorie Karin Dakessian, Amy Zapp, Harrisburg, for Com. of PA.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

Justice NEWMAN.

Walter Ogrod (Appellant) appeals his convictions at his second trial for murder in the first degree,[1] and attempted involuntary deviate sexual intercourse,[2] as well as the imposition of the penalty of death by the Court of Common Pleas of Philadelphia County (trial court) for the July 12, 1988 sexual assault and killing of four-year-old Barbara Jean Horn (Barbara Jean).[3] Our review of the conviction and sentence begins with a brief discussion of the October 1993 first trial of Appellant and the circumstances pursuant to which the trial court declared a mistrial. We then set forth the facts of the case as presented by the witnesses at the second trial in 1996. With that groundwork in place, we proceed to address the claims of error of Appellant.

### Mistrial and Denial of Appellant's
### Double Jeopardy Claim

Judge Juanita Kidd Stout (Judge Stout) was the presiding judge of the first trial. Jury selection began on October 15,

---

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. §§ 3123; 901(a).

3. This is a direct appeal from the imposition of the death penalty. 42 Pa.C.S. § 9711(h)(1).

1993. The trial itself took eight and a half days. Judge Stout charged the jury on November 2, 1993. After less than nine hours of deliberations, the jurors indicated to Judge Stout that they were deadlocked. Judge Stout instructed the jurors on their duty to consult with one another and to reexamine their opinions if convinced they were erroneous. Jury deliberations resumed. Once the jury left the courtroom, defense counsel requested a mistrial, which the judge denied: "not at this point.... It is not proper under the law to grant a mistrial at this point." N.T. 11/3/93 at 1125–1126. However, eventually the jury was unable to reach a unanimous verdict and the trial court declared a mistrial.

The trial court described the events leading to the mistrial as follows:

On November [3 [4]] 1993 at 2:55 p.m., the jury sent a note to the Court indicating it was unable to reach a unanimous verdict. The Court advised the jury that it had been deliberating only 8 1/2 hours after having heard testimony for 8 1/2 days. The guidelines for deliberations were reread to them and the deliberations resumed at 2:59 p.m. The Appellant's attorney moved for a mistrial. The motion was denied. The jury continued to deliberate until 5 p.m. or thereabouts. On November [4 [5]], 1993 at 10:35 a.m., the jury requested a· review of the definition of reasonable doubt. That was given at 10:45 a.m. and the jury returned to deliberate. Between 10:45 a.m. and 2:15 p.m., screaming and table banging were audible in the hallway.

At 2:15 p.m., on one sheet of paper, the Court received the following two notes[:]

"Hon. Juanita K. Stout Court number 513 11/3/93. It has become apparent from the deliberations that the jury has

4. Appellant points out that the trial court stated that this event occurred on November 2, 1993, but that the notes of testimony demonstrate that it occurred on November 3, 1993 (N.T. 11/3/93, at 1124–1125).

5. Appellant advises that the trial court stated that this event occurred on November 3, 1993, but it actually occurred on November 4, 1993 (N.T. 11/4/93, at 1130–1133).

been unable to reach a unanimous decision. Vote 11–1 respectfully submitted Charles Graham. Foreman."

"It has been said that there is *NOTHING* that can be said to convince or change the mind of the juror who does not agree. The juror has stated this and a unanimous verdict is not possible Charles T. Graham, Foreman."

The Court requested the Sheriff to bring the defendant to the Courtroom and notified counsel to return. During this brief interval, the jury foreman advised the Court crier that a verdict had been reached after all. The crier then advised the jury of the procedure for announcing the verdict and told the jurors that they might be polled.

After the defendant and attorneys had assembled, the jury was brought into the courtroom at 2:25 p.m. At that time, the following occurred:

COURT CRIER: Good Afternoon, your Honor, your Honor may I take the verdict, please?

THE COURT: You may.

COURT CRIER: Ladies and Gentlemen of the Jury, you have agreed upon a verdict?

THE JURY: Yes, we have.

COURT CRIER: Have all twelve agreed?

JUROR NUMBER 2: No.

COURT CRIER: On—.

SPECTATOR: Wait a minute.

JUROR NUMBER 2: I don't agree with the verdict.

THE COURT: If you do not agree with the verdict, I will have to declare a mistrial.

Opinion of Stout, J. at 1–3. The juror did not agree and, on November 4, 1993, the trial court declared a mistrial. N.T. 11/4/93, at 1135.

On November 12, 1993, Appellant filed a motion to bar retrial claiming a violation of the Double Jeopardy Clause of the United States Constitution. The trial court denied the motion on November 30, 1993.[6] On December 7, 1994, the

6. *Commonwealth v. Ogrod,* No. 3278/92, slip op. at 3 (C.P.Pa. February 7, 1994).

Superior Court affirmed the decision of the trial court.[7] On June 21, 1995, this Court denied Appellant's petition for allowance of appeal. On January 16, 1996, the United States Supreme Court denied Appellant's petition for a writ of certiorari.[8] On June 25, 1996, Appellant sought federal habeas corpus relief claiming that a retrial would violate federal constitutional protections against double jeopardy. On September 18, 1996, the United States District Court for the Eastern District of Pennsylvania denied the habeas petition.[9]

## Second Trial

The second trial of Appellant before Judge Stout began on September 16, 1996. On October 8, 1996, after several days of trial, the jury found Appellant guilty of attempted involuntary deviate sexual intercourse and murder in the first degree. A penalty phase hearing ensued. At its conclusion, the jury found one aggravating circumstance[10] and no mitigating circumstances and set the penalty at death. Appellant filed post-sentence motions, which were assigned to Senior Judge David N. Savitt (Judge Savitt) following the death of Judge Stout. On December 20, 1999, the trial court held an evidentiary hearing on Appellant's allegations of trial counsel ineffectiveness.[11] On May 25, 2000, Judge Savitt denied the post-sentence motions.

7. *Commonwealth v. Ogrod*, No. 3855/93, slip op. at 2, 441 Pa.Super. 670, 657 A.2d 52 (Pa.Super. December 7, 1994).

8. *Ogrod v. Pennsylvania*, 516 U.S. 1076, 116 S.Ct. 782, 133 L.Ed.2d 733 (1996).

9. *Commonwealth v. Ogrod*, No. 96–CV–4587, slip op. at 8 (Report and Recommendation of Magistrate Judge James R. Melinson, E.D. Pa. August 27, 1996) adopted by Order of Judge Stewart Dalzell (E.D.Pa. September 18, 1996). In this appeal, Appellant reasserts his claim that the second trial violated the Double Jeopardy Clause of the United States Constitution. *See infra* pp. 316–17.

10. The aggravating circumstance the jury found was that the killing occurred while in the perpetration of a felony. 42 Pa.C.S. § 9711(d)(6).

11. As a harbinger of what we now see in this appeal where counsel for Appellant demonstrates his seemingly limitless ability to formulate innumerable claims of error from relatively clean testimony, the December 16, 1998 post-sentence motion raised 441 issues.

## Statement of Facts

The record of the second trial established the following facts.[12] The first witness the Commonwealth called was Joanna Zablocky (Ms. Zablocky), who on July 12, 1988, the date the body of four-year-old Barbara Jean was discovered, lived at 1409 Saint Vincent Street with her father, mother and older sister. Notes of Testimony (hereinafter, "N.T.") 9/30/96 at 139–140. Ms. Zablocky testified that at 5:30 P.M., her mother told her that someone had left a box in the front of the house. *Id.* at 140–141. Because the trash had just been picked-up earlier that day, the father of Ms. Zablocky (Mr. Zablocky) went out to look at the box. After looking in the box, he yelled into the house that there was a baby in the box. Ms. Zablocky called 9–1–1. *Id.* at 141. Her father shouted, again saying that the baby was dead. *Id.* Ms. Zablocky testified that she told the 9–1–1 operator that there was a box in front of her house with a dead baby in it. *Id.* The Zablockys waited for police to arrive and Mr. Zablocky stood near the box to make sure that no one disturbed it. *Id.* Ms. Zablocky described the box as a television box and identified it in court. *Id.* at 145–146. At approximately 5:45 or 5:50 P.M., the Zablockys flagged-down a police officer, who stayed with the box until other officers arrived. *Id.* at 141. Ms. Zablocky later asked police if she could look in the box. An officer briefly lifted the lid. Ms. Zablocky told the jury that she saw a child's body on its side and a little head with a green trash bag on top. *Id.* at 148–149. She also identified the bag as similar to the one the prosecution marked as an exhibit. *Id.* at 148.

The Commonwealth then called Michael Massi (Mr. Massi), a sixty-eight year old man, who on July 12, 1988 was the sales manager of an automobile dealership. *Id.* at 156. Mr. Massi testified that on that day at approximately 5:00 or 5:30 P.M. he had stretched out in a chair and was looking from an office window and onto-Saint Vincent Street. *Id.* at 157. He said

12. We have undertaken an independent review of the record and set forth the facts in the manner in which the witnesses presented them to the jury.

that he saw a man approximately twenty-five feet away carrying a television box. *Id.* at 158, 162. The man held the box in such a way that Mr. Massi could see printed on the box the words "color television, 13 inches." Mr. Massi identified the box the prosecution had marked as an exhibit, describing it as the box he saw the day the body of Barbara Jean was discovered. *Id.* at 157. Mr. Massi explained that he thought that the box was heavy because when the man "got on the other side of Saint Vincent Street, he laid the box down, so as to sort of catch your breath." *Id.* at 158. After carrying the box down the sidewalk in front of a church on Saint Vincent Street, the man then started to drag it by a plastic bag that was sticking out of the box. *Id.* at 158–161. Mr. Massi told the jury that he never saw the face of the man, that he only "saw the back of his head, and maybe a little profile of the right side, but that's about it." *Id.* at 166. He said that the man was Caucasian, with dark brown or black hair, and estimated that the man was in his early thirties, was between 5'6" and 5'9" in height and weighed approximately 170 pounds. *Id.* at 168–169. Mr. Massi could not identify anyone in the courtroom as the person that he saw. *Id.* at 168.

David Schectman (Mr. Schectman) was the next Commonwealth witness. N.T. 10/1/96 at 9. He testified that in 1988, he lived at 1429 Saint Vincent Street. *Id.* at 10. He explained that at 5:12 P.M., he was sitting on the tailgate of his Chevrolet station wagon reading a newspaper. His wife, Lorraine, was in the passenger seat. They were waiting for their children to return home in the camp van before leaving for Lorraine's doctor appointment. *Id.* at 10–11. Mr. Schectman testified that he saw a man near the church approach his house alternately carrying a 13–inch color television box and dragging it by a plastic bag that was inside the box. *Id.* at 11–14. Mr. Schectman identified the 13–inch color television box in court as the box he saw the man with on July 12, 1988. *Id.* at 13–14. He testified that he observed the man walk up his steps. *Id.* at 13. Mr. Schectman told the man not to leave the box because the trash had already been removed. *Id.* at 13, 17. Mr. Schectman testified that the man said that he

thought that Wednesday was trash day but Mr. Schectman told him that trash day was Tuesday and that it had been picked-up already. *Id.* at 17, 32–33. Mr. Schectman also asked the man what was in the box. The man said that it just contained some old junk. *Id.* When the man continued on his way, Mr. Schectman turned his attention to a newspaper delivery boy who had just arrived. *Id.* at 16, 22. At 5:23 P.M., the Schectman children came home, and Mr. Schectman testified that he lost track of the man with the box. *Id.* at 16. At 5:26 P.M., Mr. and Mrs. Schectman drove away from their house to go to Lorraine's doctor appointment. *Id.* at 16–17. As they drove west on Saint Vincent Street, Mr. Schectman saw the 13–inch color television box in front of 1409 Saint Vincent Street, but they continued to the doctor's appointment. *Id.* at 17.

Mr. Schectman testified that when they returned, police had blocked off the street. *Id.* at 18. He looked up the street and recognized the color television box. He approached the scene and told police that he had seen the box being carried. *Id.* at 19. Mr. Schectman admitted that he only saw the man's face briefly but provided police with a description of the man as a white male between 20 and 25, about 5'8" in height, 165 pounds with sandy colored hair. *Id.* at 21–22. Mr. Schectman could not identify Appellant in court. *Id.* at 24.

Mr. Schectman admitted on cross-examination that on January 13, 1989, he had identified another man as the person he saw carrying the television box on July 12, 1988, and gave the police a statement. *Id.* at 43. The statement recorded that on January 13, 1989, a detective transported Mr. Schectman to a local gym. Mr. Schectman identified a man and gave the police the following statement after he exited the gym, which stated, in relevant part:

As I moved and turned to get a look at the male seated on the bench behind me, this male looked at me. He became nervous, turned his head away, when I looked, he sort of had his head down, not watching the males playing ball. I, at once, recognized this male as the male I had seen carrying the TV box west on Saint Vincent Street on July

12, 1988, the box west on Saint Vincent Street on July 12, 1988, the box Barbara Jean Horn's body was found in. . . . This male stood up, turned his head away from me and walked away from me out of the gym. I let him get out of the gym, then I walked out.

*Id.* at 43–44. Defense counsel read the foregoing statement and pointed out that at the time detectives asked him whether he was positive that the man he identified was the one that he saw. Mr. Schectman had responded that he was "very positive. No doubt in my mind whatsoever." *Id.* at 44. He also said that he could not say whether the man he saw in the gym was Appellant. In fact, it appears that the man at the gym was a man named Ross Felice (Mr. Felice), whom police had suspected, but never charged with any crime. *Id.* at 46–47; N.T. 10/4/96 at 105.

Lieutenant Maureen Kelly (Lieutenant Kelly) was the first police witness the prosecution called to the stand. N.T. 10/1/1996 at 72. In July of 1988, Lieutenant Kelly was a sergeant in the Homicide Division of the Philadelphia Police Department. *Id.* at 73. She told the jury that on July 12, 1988, she responded to a call at 1409 Saint Vincent Street and arrived at approximately 6:45 P.M. with other detectives who were members of the Homicide Division. *Id.* at 74. She testified that when she arrived, other officers had blocked off the 1400 block of Saint Vincent Street and uniformed police officers protected 1409 Saint Vincent Street. *Id.* Lieutenant Kelly and the other detectives observed the television box, opened it and saw the body of a young child in the box. *Id.* at 74–75. Soon after, she learned that a little girl who lived at 7245 Rutland Street, approximately a block and a half away, was missing. *Id.* at 75–76. Lieutenant Kelly went to the Rutland Street home of the parents of Barbara Jean, Sharon and John Fahy. She told them that police had found a television box nearby and that the box contained the body of a child. Lieutenant Kelly told the Fahys that she did not know if the child was their daughter. *Id.* at 76. The Fahys identified the body at the office of the Medical Examiner as the body of their daughter. *Id.* at 76.

The Medical Examiner had opened the box in the presence of Lieutenant Kelly, who told the jury that when she looked inside she saw a green trash bag covering the dead body of Barbara Jean. *Id.* at 80–81. Lieutenant Kelly testified that Barbara Jean was completely nude and she was in a fetal position lying on her side. *Id.* at 85. Lieutenant Kelly did not observe any blood on the body, but the child's hair was matted with blood. Lieutenant Kelly explained that she thought that the body had been washed. *Id.* at 86. The body had bruises on the shoulders and a large gash on its head approximately one-half inch wide, which was not actually bleeding at the time, but there was some seepage. *Id.* at 86–87, 94. Lieutenant Kelly showed the jury the box and pointed out some fluid and bloodstains that remained inside the box. *Id.* at 81. After the Medical Examiner removed Barbara Jean from the box, police preserved the box as evidence. *Id.* at 79. Lieutenant Kelly told the jury that detectives had determined that the Ward family had purchased the television and apparently discarded the box. *Id.* at 97–98; N.T. 10/2/96 at 38.[13] Notwithstanding that police attempted to identify fingerprints on the box and the bag, no prints have been identified as belonging to Appellant, Ross Felice or any other suspect. N.T. 10/1/1996 at 101–102, 106; N.T. 10/2/96 at 110–115.

The Commonwealth then presented the testimony of Dr. Haresh Mirchandani (Dr. Mirchandani), a forensic pathologist and the Chief Medical Examiner for the City of Philadelphia, who testified regarding the findings of his office, and Dr. Lucy Rorke (Dr. Rorke), a forensic neuropathologist, who testified regarding the internal examination of the brain of Barbara Jean. N.T. 10/1/1996 at 107. Dr. Mirchandani testified that the external lacerations on the head of Barbara Jean allowed him to determine with a reasonable degree of medical certainty that the cause of death was the blows to the head consistent with a metal rod. *Id.* at 117, 122. The internal examination

13. The Ward family resided at 7208 Rutland Street, which was on the same street and shared a driveway with, 7244 Rutland Street, where Appellant lived on the date the body of Barbara Jean was discovered. *Id.* at 97–98; N.T. 10/2/96 at 38.

by Dr. Rorke of the brain confirmed that the cause of death was blows to the head. *Id.* at 143.

John Fahy (Mr. Fahy), the stepfather of Barbara Jean, testified that on the afternoon of Wednesday, July 12, 1988, Barbara Jean was at home with him, at 7245 Rutland Street. *Id.* at 147. He explained that on the morning of July 12, Sharon Fahy (Mrs. Fahy), his wife and the mother of Barbara Jean, went to work. Barbara Jean dressed herself that morning in pink shorts and a multi-colored sleeveless shirt with pastel stripes. *Id.* at 151. Mr. Fahy fed her breakfast, played with her, and he then watched television with her. *Id.* at 149. They went to a small grocery market, came home and Barbara Jean had lunch. *Id.* at 152. Mr. Fahy estimated that at approximately 3:00 P.M. he started to clean the refrigerator and Barbara Jean, who was "in and out of the house most of the day," came in and asked if she could help. Mr. Fahy told her no and to go outside and play, which she did. *Id.* Barbara Jean went into their front yard to play. After forty-five minutes to an hour, Mr. Fahy went out to check on Barbara Jean. *Id.* at 153. Although he saw her toys in the yard, he told the jury that he did not see Barbara Jean and she did not return when he called to her. *Id.* at 153–154. Mr. Fahy proceeded to talk with some neighbors and look for Barbara Jean. *Id.* at 154. At 4:55 P.M., he "started getting really nervous" and called his wife. Mrs. Fahy told him to keep looking and that she would come home. *Id.* The sister of Mrs. Fahy came to the house and joined Mr. Fahy in the search for Barbara Jean. *Id.* at 154.

Mrs. Linda Green lived across the street at 7244 Rutland Street with her husband Charles, and Charles Green, Jr., a five-year old playmate of Barbara Jean. The Greens lived in Appellant's house. *Id.* at 155. Mrs. Green heard Mr. Fahy calling for Barbara Jean, but she did not see the child. At approximately 6:00 P.M., the sister of Mrs. Fahy, who had been out looking for Barbara Jean, returned in a police vehicle. *Id.* at 159. Soon after, Lieutenant Kelly arrived and told the Fahys that the body of a child had been found nearby in a television box. *Id.*

The testimony of Mrs. Fahy was brief. She stated that she gave Lieutenant Kelly a photograph of Barbara Jean and accompanied her to the police station. N.T. 10/2/96 at 7. The next morning, the Fahys went to the Office of the Medical Examiner and identified the body of her daughter, Barbara Jean. *Id.* at 9. She also told the jury that, before the murder, she did not want Barbara Jean to play at the Green's house because, "it was really a mess in there and there was a lot of people always coming and going [and that she] ... had no idea who exactly lived there and who didn't." *Id.* at 11.

The Commonwealth called Detective Edward Rocks (Detective Rocks) to testify in court. Detective Rocks investigated an entirely separate murder that occurred at the Ogrod/Green residence in July of 1986. *Id.* at 75. The parties agreed that Appellant had nothing to do with that murder, but, as part of the investigation, police had taken photographs of the basement of the residence of Appellant, which the prosecutor used in this case. Detective Rocks told the jury that the photographs of the basement showed the presence of a weight set with a pull-down bar. *Id.* at 80.

Despite an investigation during which police interviewed several witnesses, including Appellant, police were not able to solve the murder. N.T. 10/3/96 at 29–29. However, in 1992, the Police Homicide Division Special Investigations Unit reexamined the evidence. *Id.* at 26. Detective Martin Devlin (Detective Devlin) testified that he and his partner, Detective Paul Worrell (Detective Worrell) (collectively, the Detectives), proceeded to review the file and interview witnesses. *Id.* at 27, 29–30. After meeting with the Green family, they decided to interview Appellant. *Id.* at 30–32. Detective Devlin explained that the Greens told them that Appellant left his 7244 Rutland Street residence and that he was now living in an apartment in Glenside, Pennsylvania. *Id.* at 32. Appellant was not at home when the Detectives attempted to interview him. *Id.* at 33. They left a card for Appellant on which they wrote that they wanted to talk with him regarding Mr. Fahy. *Id.* at 34. Appellant left messages for the Detectives, who requested that Appellant meet with them. *Id.* at 36.

Appellant agreed to come to the Police Administration Building at 8th Street and Race Street on Sunday, April 5, 1992.[14] N.T. 9/7/93 (Suppression N.T.) at 17–19; N.T. 10/3/96 (Trial N.T.) at 36–37. Despite the fact that Appellant was not scheduled to meet with Detectives until 6:00 P.M., he arrived at approximately 3:45 P.M. Suppression N.T. at 21; Trial N.T. at 36, 45. Detective Devlin testified that before the interview, police had no information that Appellant was involved in the murder of Barbara Jean. Suppression N.T. at 22; Trial N.T. at 43. Detective Devlin first met Appellant between 5:15 P.M. and 5:30 P.M. that Sunday while Appellant was sitting on a bench near the Homicide Unit waiting for his interview. Suppression N.T. at 22–23; Trial N.T. at 37. Detective Devlin identified Appellant at the hearing as the person who came in and eventually gave a statement. Suppression N.T. at 24; Trial N.T. at 42. The Detective described his impression of Appellant upon their first meeting as seeming "normal," "dressed neatly . . . clean . . . certainly did not seem to be under the influence of any drugs or alcohol." Suppression N.T. at 23–24; Trial N.T. at 42 (at trial, he added that Appellant did not appear to have been deprived of sleep or food). The Detectives interviewed Appellant in an interview room. Suppression N.T. at 24–25; Trial N.T. at 42. After obtaining biographical information, the Detectives had a ten-minute conversation during which they told Appellant that they asked him to come in as an information witness and that they were interested to know whether he knew Barbara Jean, her family, the neighborhood and whether he had heard any

14. In addition to testifying at the second trial, Detective Devlin testified at the September 7, 1993 suppression hearing. In this appeal, the testimony of Detective Devlin at the second trial and at the suppression hearing was relevant to several issues. For example, his suppression hearing testimony is relevant to the claim of Appellant that the trial court committed error by denying his motion to suppress his statement. Similarly, the testimony of Detective Devlin at the second trial is relevant to several issues including, but not limited to, whether the evidence was sufficient to support the conviction of Appellant. Accordingly, we provide transcript references with regard to his testimony at the September 7, 1993 suppression hearing (N.T. 9/7/93 at 14) and at the second trial (N.T. 10/3/96 at 24).

rumors about the murder. Suppression N.T. at 27; Trial N.T. at 47.

The Detectives then proceeded to conduct the formal interview by asking a question, writing down the question, and then writing down the answer Appellant provided. Suppression N.T. at 26–28; Trial N.T. at 47–48. The first question was "Walter, did you know Barbara Jean Horn?" Suppression N.T. at 26; Trial N.T. at 48. Appellant admitted that he knew Barbara Jean and that she came to the house he shared with the Green family on the day of the murder. Suppression N.T. at 28–29; Trial N.T. at 49–50. Appellant told police that he answered the door when Barbara Jean was calling on young Charlie Green, Jr. (Charlie Jr.) and that Appellant told her to talk with Mrs. Green because he did not know where Charlie Jr. was. Suppression N.T. at 29; Trial N.T. at 49–50. That was the last time Appellant claimed to have seen Barbara Jean. Suppression N.T. at 29; Trial N.T. at 50.

Appellant told the Detectives that he never asked Mrs. Green whether she saw Barbara Jean and that he did not know whether Barbara Jean ever found Mrs. Green because he went upstairs. Suppression N.T. at 30; Trial N.T. at 50–51. When the Detectives asked Appellant what part of the house Mrs. Green was in at the time Barbara Jean came into the house, Appellant said that she was in the dining room. Suppression N.T. at 30–31; Trial N.T. at 51. Because one of the Detectives claimed to be familiar with the "straight-through" layout of the row house, he asked Appellant, "wasn't it true that you should have been able to see directly into the dining room and see Mrs. Green if she were there?" Suppression N.T. at 30–31; Trial N.T. at 51. Appellant responded that perhaps Mrs. Green was in the kitchen, which was not visible from the front door. Suppression N.T. at 30–31; Trial N.T. at 51. The Detectives then said: "you are not telling us the truth, are you, Walter?" Suppression N.T. at 30–31; Trial N.T. at 51.

Detective Devlin testified that, at this point, Appellant put his head in his hands and started to cry and the Detectives took a break to allow Appellant to compose himself. Suppres-

sion N.T. at 30–31; Trial N.T. at 51–52 (at trial, Detective Devlin explained that when he means crying he did not "mean a tear ran down his cheek. [He meant that Appellant] . . . started crying hard and convulsively"). Detective Devlin arranged for Appellant to get a cup of coffee and Detective Worrell showed him to the bathroom and, after a break, brought him back to the interview room. Suppression N.T. at 33; Trial N.T. at 53–54.

When Appellant returned, he began talking before the Detectives started to question him. Suppression N.T. at 33; Trial N.T. at 55. He explained that he experienced abuse as a child and that he went to live with his father when he was ten or eleven. Suppression N.T. at 34–35; Trial N.T. at 55–56. Then, he said that he was going to tell the Detectives something that he never told anyone including his psychiatrist. Suppression N.T. at 34–35; Trial N.T. at 56. At this point, the Detectives told Appellant that before he went any further, they were going to read him his rights. Suppression N.T. at 36; Trial N.T. at 56–58. Detective Worrell read Appellant his *Miranda*[15] warnings. Suppression N.T. at 36; Trial N.T. at 56–58. After providing oral warnings, Appellant signed a form answering the following questions:

Question 1: Do you understand you have a right to keep quiet? You do not have to say anything at all? Appellant wrote the word yes.

Question 2: Do you understand that anything you say can and will be used against you? Appellant wrote yes.

Question 3: Do you want to remain silent? Appellant wrote no.

Question 4: Do you understand you have a right to talk to a lawyer before we ask you any questions? Appellant wrote yes.

Question 5: Do you understand that if you cannot afford to hire a lawyer and you want one we will not ask you any

15. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

questions until a lawyer is appointed free of charge? Appellant wrote yes.

Question 6: Do you want to talk with a lawyer at this time or have a lawyer with you while we ask you any questions? Appellant wrote no.

Question 7: Are you willing to answer questions of your own free will without any force or fear or threat or promise having been made to you? Appellant answered yes.

Suppression N.T. at 37–38; Trial N.T. at 59–60.

One of the Detectives then said, "Walter, you indicated you want to give us a statement at this time. Remember, you can stop whenever you want to. Please go on in your own words and tell us what you would like to say." Suppression N.T. at 40; Trial N.T. at 62. Appellant gave Detectives a detailed account of how he killed Barbara Jean. He told the Detectives that Barbara Jean came to his door looking for Charlie Jr., who was not at home, and Appellant enticed Barbara Jean into the basement asking her if she wanted to play doctor. Suppression N.T. at 43; Trial N.T. at 63. Appellant proceeded to take off her clothing and started rubbing his penis against her leg. Suppression N.T. at 43; Trial N.T. at 64. When he tried to push her face into his penis, Barbara Jean started to scream. Suppression N.T. at 43; Trial N.T. at 64. Appellant admitted that he held her down and hit her repeatedly with a pipe; he explained that "it might have been my small pull down bar to my weight set." Suppression N.T. at 43; Trial N.T. at 64. She did not move again after that. Suppression N.T. at 43; Trial N.T. at 64. She was bleeding and Appellant told Detectives that he grabbed a cloth and placed her in the tub holding her head under water. Suppression N.T. at 43; Trial N.T. at 65. Appellant then described how he disposed of the body of Barbara Jean by placing her in a plastic bag, locating an empty box nearby, placing the body in the box, and carrying the box some distance before deciding to leave it near some garbage cans. Suppression N.T. at 44–46; Trial N.T. at 65–67. The Detectives showed Appellant photographs of the box, first closed—Appellant identified the box as the one that he had placed the child in; and then

open—Appellant confirmed that Barbara Jean was in the box. Suppression N.T. at 48; Trial N.T. at 69.

When Appellant completed his statement, the Detectives left the room and returned with a few other questions. Appellant then confirmed that the statement was the whole truth. Detectives gave the entire statement to Appellant to read. Appellant complied. Suppression N.T. at 50; Trial N.T. at 73–74. Detectives asked, "is there anything you would like to add to or change now that you have read these 16 pages?" Appellant responded by saying, "I am sorry." Suppression N.T. at 51; Trial N.T. at 74. Appellant then signed the statement. Suppression N.T. at 51; Trial N.T. at 75.

The next witness to testify for the prosecution was Jason Banachowski (Mr. Banachowski), who was incarcerated on the same cellblock as Appellant during some of the time between the November 4, 1993 mistrial and the September 1996 retrial. N.T. 10/4/96 at 7–8. Mr. Banachowski testified that Appellant told him that on July 12, 1988, Appellant came home from work because it was slow and lured Barbara Jean to his house. *Id.* at 9. He said that Appellant told him that his boss had asked him to give out fliers for the company; however, it was hot and Appellant threw them away. "He said he then went home and was peeking out the windows looking for Barbara Jean across the street." *Id.* at 11. Mr. Banachowski told the jury that Appellant admitted to stalking her twice before because he wanted to molest her and kill her. *Id.*

> After a while, he seen Barbara Jean coming out, and he said sure enough, she would come out like clockwork, and he stood in his doorway making kissing noises at the little girl, hiding. He was hiding so she wouldn't see him. She started looking around to see where the kissing noises were coming. When she realized it was across the street, she came running over. He gave her a chocolate Hershey's kiss and then took her to the basement.

*Id.* at 12. According to Mr. Banachowski, Appellant told him that he took her to the basement and "tried to get her to perform oral sex on him." *Id.* When she became frantic, Appellant hit her with his hand and "she became hysterical

and she tried to get away, so Walter grabbed her and threw her on the ground and ripped her clothing off and tried to have intercourse with her." *Id.* at 12–13. "He said that she was too small to enter. He became enraged, tried to grab an electrical cord he had placed in the basement, but it was missing . . . then he grabbed a weight bar and smacked her in the head with it." *Id.* at 13. Mr. Banachowski testified that Appellant told him that he disposed of the body in a television box and left it on Saint Vincent Street. *Id.* at 14.

In January of 1995, and again later that year, Mr. Banachowski wrote letters to representatives of the Office of the District Attorney of Philadelphia and told them that Appellant had admitted that he murdered Barbara Jean. The letters provide a detailed account of the manner in which Mr. Banachowski claimed that Appellant told him that he stalked, assaulted and killed Barbara Jean, and disposed of her body. Counsel for Appellant read the two letters into evidence during his cross-examination of Mr. Banachowski. N.T. 10/4/96 at 31–60. Defense counsel also reviewed the statement Mr. Banachowski gave to Detective Michael Gross (Detective Gross) on March 20, 1995, after he wrote the letters to the Office of the District Attorney. *Id.* at 63. In that statement, Mr. Banachowski explained that he wrote the letters in his own handwriting, that no one advised him to write the letters, that he was in no way involved in the murder, and that no one in law enforcement promised him anything in return for writing the letters. *Id.* at 64–66. When police asked him why Appellant would talk to him, Mr. Banachowski stated that he believed it was because he did not make fun of Appellant. *Id.* at 66. Other prisoners would "say things like Baby In the Box" to Appellant; who would respond, "Wack um and Sack um." *Id.* at 68. At the end of the statement, Detective Gross instructed Mr. Banachowski that he was no longer permitted to start any conversation with Appellant regarding the Barbara Jean Horn case, and he agreed not to do so. *Id.* at 69. Defense counsel elicited testimony that Mr. Banachowski pled guilty to the charges against him two days after the interview with Detective Gross

and he characterized his sentence of three years and four months plus three years probation for three attempted burglaries and parole violations as a bargain. *Id.* at 75. However, he also stated that no one asked him at the time of the sentencing whether he would testify against Appellant. *Id.* at 80.

At this point, the Commonwealth rested its case.

Appellant called Jonathan Jones (Mr. Jones). He testified that he was a resident of 7160 Rutland Street in 1988. *Id.* at 92. Defense counsel showed Mr. Jones a picture of Ross Felice (Mr. Felice). *Id.* at 93. Mr. Jones testified that the picture was of Mr. Felice. *Id.* Mr. Jones told the jury that he knew both Mr. Felice and Appellant. *Id.* at 92, 96. He said that he saw Mr. Felice walking around the neighborhood on July 13, 1988, the evening after the body of Barbara Jean was found. *Id.* at 94–95. He testified that Mr. Felice, who he claimed was 5'6" to 5'7" tall and weighed approximately 160 pounds, was walking around the neighborhood until late that night asking many questions about what happened to Barbara Jean and whether police had found her killer. *Id.* at 92, 94–95.

Counsel for Appellant then read the testimony of Detective Michael Duffy (Detective Duffy) from the portion of the first trial, which took place on October 27, 1993. *Id.* at 97. The transcript reflects that Detective Duffy testified that he was a homicide detective in July of 1988 and that on July 14, 1988 he showed a sketch of the suspect (that apparently did not resemble Appellant) to Mr. Massi (the car salesman who testified for the prosecution). N.T. 10/27/93 at 698–699. Detective Duffy stated that Mr. Massi had told him that the sketch was a good likeness and that the hairstyle was like the man he saw carrying the box. *Id.* at 699.

The last witness Appellant called was Detective David Ridgway (Detective Ridgway), who in 1988 and 1989 was employed by the Philadelphia Police Department as a detective in the Major Crimes Division. N.T. 10/4/96 at 99. Detective Ridgway testified that he followed Mr. Felice for six months

beginning in November 1988. *Id.* at 100, 112. On January 13, 1989, Detective Ridgway had followed Mr. Felice to the gymnasium at the Solis Cohen School. *Id.* at 100–101. Detective Ridgway told the jury that he then called Mr. Schectman, picked him up at his house, drove him to the school, and asked him to go inside the gym to see if he recognized anyone. *Id.* at 102. Mr. Schectman positively identified Mr. Felice as the man he saw carrying the television box. *Id.* at 103–104. On cross-examination by the prosecution, Detective Ridgway testified that Mr. Felice was never arrested with regard to the killing of Barbara Jean. *Id.* at 105.

Appellant did not testify at the second trial. However, counsel for Appellant, the prosecutor and Judge Stout conducted a colloquy of Appellant, who confirmed that he was satisfied with the assistance of his counsel. *Id.* at 119. Defense counsel asked Appellant whether his decision not to testify was of his own free will and whether anyone had forced him not to testify or promised him anything for declining to do so. *Id.* at 121. Appellant told the trial court that he had discussed the reasons for and against testifying with his counsel and that he agreed with the strategic decision not to testify. *Id.* at 120–122. Appellant explained that he helped defense counsel select the jury and that he and his attorney discussed the pros and cons of calling character witnesses and that he agreed with the strategic recommendation of his attorney that it would not be in the best interests of Appellant to call character witnesses. *Id.* at 117, 123. Appellant admitted that he was aware that his counsel had character witnesses available to testify in the event Appellant wanted such testimony and he agreed that he did not wish to call such witnesses. *Id.* at 123–124. Appellant stated that he was present for the proceedings and that he was not under any medication that would prevent him from understanding the events that had been transpiring at trial. *Id.* at 117. Appellant confirmed that he was not in any way dissatisfied with the performance of his counsel and that defense counsel did not force him to do anything against his will regarding the trial. *Id.* at 126.

The defense rested and the parties presented their closing arguments to the jury. On October 8, 1996, the jury found Appellant guilty of attempted involuntary deviate sexual intercourse and murder in the first degree. At the conclusion of the penalty phase hearing, the jury found one aggravating circumstance—that the murder was committed during the perpetration of a felony—and that there were no mitigating circumstances and set the penalty at death.

## Claims of Error

We now review the claims of error of Appellant. We begin with his argument that the second trial should never have occurred because it constituted double jeopardy. We then review the sufficiency of the evidence before addressing claims of error from the suppression hearing, the guilt phase, and the penalty phase.[16] Finally, we conduct a proportionality review of the penalty of death imposed upon Appellant.[17]

## The Double Jeopardy Claim

Appellant alleges that he was retried in violation of the Double Jeopardy provisions of the United States and Pennsylvania Constitutions. He argues that when a defendant does not request a mistrial but one is declared, a second prosecution violates the Double Jeopardy clauses unless declaring a mistrial was manifestly necessary. *Commonwealth v. Diehl,* 532 Pa. 214, 615 A.2d 690 (1992). Appellant quotes *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), which sets forth the commonly cited reasons for the prohibition against twice putting a defendant in jeopardy as follows:

16. Throughout the opinion, we address the claims of ineffective assistance of counsel and prosecutorial misconduct.

17. "Effective June 25, 1997, the General Assembly removed proportionality review from the death penalty statute by deleting all of subsection (h)(3)(iii) and part of subsection (h)(4) that references proportionality review. However, because Appellant's sentence of death was imposed before the effective date of the act, he is statutorily entitled to proportionality review." *Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441, 452 n. 24 (1997), *cert. denied,* 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998).

[T]he State, with all of its resources and power, should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Id.* at 187–188, 78 S.Ct. 221. Appellant then argues that the circumstances of the deadlocked jury in the first trial of this case did not rise to the level required for a finding that there was manifest necessity for the granting of a mistrial.

The Commonwealth responds by arguing that the double jeopardy claim of Appellant has already been fully and fairly adjudicated and resolved against him. The Commonwealth correctly points out that Appellant took his double jeopardy claim through the state court system, even seeking review by the United States Supreme Court, and then filed a habeas petition with the U.S. District Court, which considered the claim but eventually denied him relief.

The Commonwealth makes two arguments. First, it contends that Appellant has already litigated his double jeopardy claim, that denial of relief is the law of the case, and that, accordingly, Appellant is not entitled to relitigate his claims. Second, the Commonwealth maintains that a hung jury is a classic situation in which there is manifest necessity to grant a mistrial and that; in any event, Appellant should not be heard to object to the mistrial because it was his attorney who originally requested it. We address these claims *seriatim.*

With regard to the first argument of the Commonwealth that we need not reach the merits of the claim because the claim was previously fully and fairly adjudicated, we cannot agree. As the denial of review does not constitute a ruling on the merits, *see Commonwealth v. Davis,* 546 Pa. 158, 159, 683 A.2d 873 (1996) (*per curiam* ); *Commonwealth v. Tarver,* 493 Pa. 320, 331, 426 A.2d 569, 575 (1981), the question is raised whether the Superior Court's denial of relief on interlocutory appeal binds this Court, under the law of the case doctrine,

upon review of the trial court's final order imposing judgment of sentence.

■ This appears to be an issue of first impression in Pennsylvania. Other jurisdictions, however, have determined that a ruling on interlocutory appeal by a state's intermediate appellate court does not preclude the state's highest court from merits review of the same issue once the order becomes final. *See, e.g., Raven v. Board of Comm'rs of Wayne County,* 399 Mich. 585, 250 N.W.2d 477, 478 n. 1 (1977). Such a conclusion comports with sound logic, as an intermediate court of appeals should not possess authority to bind a court of last resort within the same proceeding, particularly where the latter court's plenary review of the trial court's final order represents the first instance in which it undertakes consideration of any aspect of the trial-level proceedings. *See Commonwealth v. Starr,* 541 Pa. 564, 574, 664 A.2d 1326, 1331 (1995) (indicating that, under the law of the case doctrine, "a court involved in the later phases of a litigated matter should not reopen questions decided by another judge *of that same court or by a higher court* in the earlier phases of the matter" (emphasis added)).

■ However, upon review of Appellant's double jeopardy claim, we do not find that his rights have been violated. Indeed, in this case, declaring a mistrial was manifestly necessary. The jury repeatedly and expressly told Judge Stout that it was unable to reach a unanimous verdict. A jury must be unanimous in its determination of whether a defendant is guilty or innocent. PA. CONST. art. I, § 6. We agree with the decisions of Judge Stout, the Superior Court, and the U.S. District Court that declaring a mistrial was manifestly necessary. We also agree that Appellant should not be heard to object to the mistrial where, as here, his attorney requested it the day before. For these reasons, the retrial did not violate the Double Jeopardy Clauses of the United States or Pennsylvania Constitutions.

## Ineffective Assistance of Counsel

Appellant raises numerous claims of ineffective assistance of counsel relative to many of his substantive issues, including a claim that counsel was ineffective for failing to object to the mistrial that the trial court granted, as described above. In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), this Court determined as a general rule that new counsel should wait for Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546, proceedings to raise claims of the ineffectiveness of his or her predecessor counsel. However, in *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 853–855 (2003), we recognized an exception to that general rule where the trial court has already addressed the claims of ineffective assistance of counsel that the defendant raises on direct appeal. In the instant matter Appellant raised his claims of ineffective assistance of counsel to the trial court on post-trial motions. The trial court conducted a hearing on the ineffectiveness issues at which counsel testified and issued an opinion rejecting those claims. Therefore, they are ripe for our review.

We discuss the ineffective assistance of counsel claims as they arise, but note here the general principles governing such claims. "To prevail on a claim that counsel was constitutionally ineffective, the appellant must overcome the presumption of competence by showing that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different." *Id.* at 855. The claim of Appellant that counsel rendered ineffective assistance for failing to object to the mistrial fails because the underlying claim lacks arguable merit. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 333 (1999).

## Sufficiency of the Evidence

"As in all cases in which the death penalty has been imposed, this court is required to conduct an independent

review of the sufficiency of the evidence even where, as here, the defendant has not specifically challenged the conviction on that ground. In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt." *Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181, 1186–1187 (1996) (citations omitted).

■ The jury found Appellant guilty of attempted involuntary deviate sexual intercourse and murder. The Crimes Code defines these terms. We begin by defining the word "attempt." The statute provides that "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901. "A person commits a felony of the first degree when he or she engages in deviate sexual intercourse with a complainant: (1) by forcible compulsion; ... or (6) who is less than 13 years of age." 18 Pa.C.S. § 3123(a). Deviate sexual intercourse includes forcing someone to have oral sex. 18 Pa.C.S. § 3101; *Commonwealth v. Perrin,* 484 Pa. 188, 398 A.2d 1007 (1979). Appellant confessed his crimes to police and to a fellow inmate. He admitted to his fellow inmate that he had stalked Barbara Jean before and wanted to molest and kill her. Further, Appellant said that he attempted to make her have oral sex with him but she became frantic so he grabbed and struck her and then tried to have vaginal sex with her but she was too small. N.T. 10/4/96 at 11–22. Appellant told police that he rubbed his penis against the leg of Barbara Jean and tried to force her head down to his penis so to have oral sex with her. Given the confessions of Appellant, it was reasonable for the jury to have believed that Appellant intended to force Barbara Jean to have oral and vaginal sex with him and that he took actions "which constitute[d] a substantial step toward[s]" that goal. 18 Pa.C.S. § 901. Consequently, we hold that there was sufficient evidence for the attempted involuntary deviate sexual intercourse conviction.

■ We now turn to the murder conviction and whether there was sufficient evidence to support it.

> The elements of first-degree murder are that the defendant unlawfully killed a human being, the defendant killed with malice aforethought, and the killing was willful, deliberate, and premeditated. The willful, deliberate, and premeditated intent to kill is the element that distinguishes first-degree murder from other degrees of murder. The Commonwealth may prove this specific intent to kill by circumstantial evidence. The use of a deadly weapon on a vital part of the victim's body may constitute circumstantial evidence of a specific intent to kill.

*Commonwealth v. Wesley*, 562 Pa. 7, 753 A.2d 204, 208 (2000) (quotations and citations omitted).

■ The evidence was sufficient for a jury to believe that the killing was premeditated, willful, and deliberate. Appellant admitted that he planned to sexually assault and kill Barbara Jean, to frame Mr. Fahy and have a relationship with Mrs. Fahy. Appellant admitted that when Barbara Jean began to scream, he looked for the electrical cord, which he had planned to use to kill her. However, when he could not find it, he struck her repeatedly with a metal bar and disposed of her body. Medical experts examined the body of Barbara Jean and testified at trial that the cause of death was homicide and that the injuries of Barbara Jean were consistent with being struck with a metal bar. Additionally, Appellant admitted that he placed Barbara Jean in a box and left the box on the street to be removed with the trash. The testimony at trial was that a nearby resident saw a box in front of his house and discovered the dead body of Barbara Jean within the box. Examining this evidence in the light most favorable to the Commonwealth, we hold that sufficient evidence existed for the jury to have found that the prosecution established all of the elements of the crime of first-degree murder beyond a reasonable doubt. Having concluded that the evidence was sufficient to support the convictions, we return to our discussion of the particular claims of error of Appellant at the suppression hearing.

## Admission of Guilt to Police

On September 7, 1993, Appellant moved to suppress his statement to police. The trial court held a hearing to determine whether the statement of Appellant would be admissible at trial. After listening to the testimony of witnesses for the Commonwealth and Appellant, including the testimony of psychological experts for Appellant, Judge Stout denied the suppression motion on September 23, 1993.

On cross-examination during the suppression hearing, Detective Devlin testified that several times during the interview Appellant had said: "I want to get this right. Be patient with me." Suppression N.T. at 41. Appellant also stated, "This is going to be hard for me." Suppression N.T. at 87. The Detective admitted that the written statement of questions and answers did not include these comments but that he recorded verbatim everything said by Appellant concerning the murder of Barbara Jean. The counsel for Appellant asked Detective Devlin whether he thought Appellant was someone who would falsely implicate himself in a crime he did not commit. *Id.* at 98. Detective Devlin responded that he had no indication of that. *Id.* Appellant's counsel also brought out that his client had initialed some crossed-out words on the statement that were misspellings or errors by the Detectives. *Id.* at 102.

 Before this Court, Appellant objects to the admission of his statement. He argues that it was not a verbatim recording of what Appellant said to the Detectives and not voluntary and, therefore, should be excluded. These arguments are without merit, but we address them. Detective Devlin testified at the suppression hearing that he wrote down all of the statements of Appellant concerning the murder of Barbara Jean. *Id.* at 88. The fact that the statement does not reflect that Appellant said that giving the statement was going to be hard for him, that he asked the Detectives to be patient because he wanted to get this right, or that he was crying during certain parts of the confession does not invalidate the statement.

It is also clear that Appellant gave his statement voluntarily. As we have often stated, the standard for determining whether a statement is voluntary is based on the totality of the circumstances and considers, among other things, whether the defendant was coerced or manipulated or promised something in exchange for his confession; essentially, we attempt to determine whether the defendant freely made the decision to give the statement. *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879 (1998). We have observed that:

> When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.

*Id.* at 882 (internal footnote and citation omitted). In this case, the Commonwealth has clearly met its burden. The Detectives properly provided Appellant with *Miranda* warnings; they determined that Appellant understood those warnings; but, nevertheless, wanted to give a statement; they provided Appellant with time to compose himself when he became upset prior to giving his statement; and, they allowed Appellant to tell his story. In fact, the Detectives told Appellant that he did not have to give a statement and that, even if he chose to give one, he could stop at anytime. Detectives also did not force Appellant to come to meet with them. Instead, Appellant called the Detectives in response to their leaving their card with his landlord. We, therefore, hold that Appellant gave the statement voluntarily.[18]

18. Because the statement was voluntary and complete concerning what Appellant said about the murder of Barbara Jean, his claim of the

## Suppression Judge Heard Content of the Confession

■ Appellant contends, for the first time on appeal, that it was error for the suppression court to allow itself to hear the *content* of the confession because he asserts that the content was irrelevant to the determination of whether the statement was voluntary. Brief of Appellant at 17. Appellant failed to object to the admission of the content of his confession during the suppression hearing and fails to provide any legal authority to support his argument that the content of the statement should have been excluded.[19] Additionally, this was not the guilt or penalty phase of the trial. The content of the confession was introduced during the suppression hearing. The jury was not present. The role of the court was to determine whether the statement was voluntary. Appellant fails to explain why the content of the statement would prevent a judge from evaluating whether the statement was voluntary. *Cf. Commonwealth v. Corbin*, 447 Pa. 463, 291 A.2d 307, 310 (1972) (a defendant suffers no prejudice when the same judge presides during the suppression hearing and the trial if the confession was deemed voluntary because the confession was admissible at trial to prove guilt). Therefore, even if Appellant had objected (which he did not) and the statement had not been used on cross-examination (which he did), we do not believe that Appellant was prejudiced by the admission of the statement at the suppression hearing.[20]

ineffectiveness of trial counsel for failing to object to the statement, as "not a verbatim transcription[,]" is without merit.

**19.** Notwithstanding that Appellant failed to object to this conduct and that the objections would normally be waived, we consider them pursuant to our relaxed waiver doctrine that is applicable to this direct appeal. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982) *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). We note that in *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), this Court abrogated the relaxed waiver doctrine prospectively. Because Appellant filed his brief before we issued our decision in Freeman, we apply relaxed waiver here.

**20.** Because the underlying claim is not meritorious, there is no basis for Appellant's claim of trial counsel ineffectiveness for failing to object to the suppression court hearing the content of the confession.

### Cross-examination at the Suppression Hearing

Appellant claims that he was denied due process of law during the suppression hearing when the Commonwealth questioned his former attorney on cross-examination regarding whether the attorney was in good standing and whether the past contact of the attorney with police created a bias against them.

At the hearing, Appellant called Peter Blust (Mr. Blust), his former attorney, to testify.[21] Appellant's first few questions for Mr. Blust involved whether he was an attorney in good standing in the Commonwealth. N.T. 9/8/93 at 127–128. Mr. Blust testified that he was. *Id.* at 128. He advised the court that he was an acquaintance of Appellant and had served as attorney for Appellant with regard to some legal problems. *Id.* at 128–129. Mr. Blust also testified that Appellant called him from jail and told him that he had been arrested, that police kept telling him that he killed a little girl, that he had a mental block about the entire matter, that police were threatening to put him in the general prison population if he did not cooperate, and that police had not allowed Appellant to contact Mr. Blust despite his repeated requests. *Id.* at 130–132.

The Commonwealth claims that it was entitled to cross-examine Mr. Blust with regard to the following: (1) subjects counsel for Appellant raised on direct-examination—so as to refute his claim that he was in good standing; and (2) his prior contact with police—to establish that Mr. Blust was biased against police and may have fabricated the claim that police wrongfully induced Appellant to confess. Brief of Appellant at 28. The Commonwealth cross-examined Mr. Blust with regard to his contention that he was a member of the bar in good standing based on their knowledge that Mr. Blust had not paid his annual fee. N.T. 9/8/93 at 134. The Commonwealth also sought to show that Mr. Blust was biased and may have had motive to fabricate his testimony. *Id.* at 148. The prosecutor asked him "you don't like cops much. Do you?" *Id.* To that end, the Commonwealth asked questions regard-

---

21. Appellant waived his attorney-client privilege with regard to communications with Mr. Blust.

ing whether Mr. Blust bore enmity towards police officers due to the manner in which they treated him when: (1) they arrested him for being intoxicated and being abusive to a police officer (*Id.* at 148); and (2) another arrest that led to his conviction for DUI. *Id.* at 149.

After reviewing the transcript, we hold that the trial court did not err by allowing cross-examination during the suppression hearing with respect to issues raised on direct examination and the issue of bias. Regarding issues raised on direct examination, cross-examination is permissible within the sound discretion of the trial court. *Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605 (2001) (finding it permissible to address the claim of Begley that he was a member of the Marine Corps). On cross-examination,

> an attorney is entitled to question the witness about subjects raised during direct examination as well as any facts tending to refute inferences arising from matters raised during direct testimony. Similarly, an attorney may discredit a witness by cross-examining the witness about omissions or acts that are inconsistent with his testimony. However, the scope and limits of cross-examination is [sic] vested in the trial court's discretion and that discretion will not be reversed unless the trial court has clearly abused its discretion or made an error of law.

*Id.* at 627 (citations omitted). The cross-examination of Mr. Blust with regard to his claim that he was an attorney in good standing was clearly within the scope of the direct examination. Accordingly, there is no basis for a finding that the trial court abused its discretion.

The trial court also correctly allowed the Commonwealth to inquire into the prior experience of Mr. Blust with police to show that he did not like police and that his bias may have caused him to improperly assert police misconduct. *Commonwealth v. Butler*, 529 Pa. 7, 601 A.2d 268, 271 (1991). In *Butler*, we explained, "the credibility of a witness may be impeached by evidence which tends to show that the witness had an interest in the outcome of the trial, or that the witness'

testimony may be untruthful, or that the witness may possess a bias which colors his testimony." *Id.* (internal citations omitted). Similarly, in *Commonwealth v. Williams*, 524 Pa. 218, 570 A.2d 75 (1990) we explained that:

> a party against whom a witness is called always has the right to show by cross-examination that a witness is biased or has an interest in the result of the trial. In the instant case, the introduction of ... [the witness'] unsentenced convictions was relevant to show ... [the witness'] potential bias against Draper because of the activities of his police officer father. Since ... [the witness] denied any knowledge that Draper's father was involved in his investigation, it was within the province of the jury to decide whether [the witness'] testimony was tainted.

*Id.* at 80 (citations omitted). *See also, Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846 (1989) *cert. denied*, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990) (evidence as to whether witness had advocated killing of police officers was admissible to show that the witness was biased against the officers). In this case, the questioning by the Commonwealth actually succeeded in getting Mr. Blust to admit that he did not like at least two individual police officers. N.T. 9/8/93 at 148, 154. There was potential bias and the Commonwealth acted properly by asking questions to show that bias. Additionally, the probative value of the testimony regarding bias clearly outweighed any prejudice to Appellant who was not the witness and who was not discredited by the prior contact Mr. Blust had with police. This was also not the guilt or penalty phase of the trial. The testimony on cross-examination came in during the suppression hearing, out of the presence of the jury. Consequently, the trial court properly allowed the Commonwealth to inquire into the prior experience of Mr. Blust with police to show that he did not like police and that his bias may have caused him to fabricate his testimony regarding police misconduct. Because we find the underlying claim not meritorious, we reject Appellant's claim of trial counsel ineffectiveness to the extent that he failed to object to the cross-examination of Mr. Blust.

## Police Activity Sheets

Appellant next claims that his defense was hampered by the failure of the Commonwealth to turn over police activity sheets because they contained evidence that police had another suspect for the crime. Brief of Appellant at 23. Appellant cites to Pa.R.Crim.P. 305B(1)(a),[22] which requires the Commonwealth to disclose any evidence that is material to either guilt or punishment, and Rule 305B(1)(f), which requires disclosure of, among other things, tangible objects. Appellant claims that the refusal of the Commonwealth to supply the actual activity sheets rises to the level of reversible error.

The Commonwealth counters the argument of Appellant by pointing out that it did provide him with summaries of the activity sheets. Brief of the Commonwealth at 30. Additionally, the Commonwealth refutes the contention of Appellant that his attorney did not have the activity sheets by pointing out that counsel introduced a police activity sheet and an activity run log at the first trial. *Id.* The Commonwealth also observes that Appellant has failed to "state which activity sheets he did or did not receive, how the police summaries that he did receive allegedly differed from the activity sheets that he supposedly did not receive, or discuss how he was prejudiced." *Id.* at 31.

The standard for review of a decision of a trial court to deny a discovery request is one of abuse of discretion. *Commonwealth v. Rucci,* 543 Pa. 261, 670 A.2d 1129, 1140 (1996), *cert. denied,* 520 U.S. 1121, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997). Appellant cannot show an abuse of discretion if he fails to show how he was prejudiced by the decision. *Commonwealth v. Brown,* 462 Pa. 578, 342 A.2d 84, 89 (1975). If the summaries included the same information as the original activity sheets, the purported lack of disclosure could not have prejudiced him. Additionally, the Commonwealth properly points out that Appellant had some police activity records in that he introduced them into evidence. N.T. 10/25/93 at 330 and 10/27/93 at 694–695. Appellant argues that he would have

**22.** Rule 305B is now Rule 573.

sought to show that the activity sheets would have showed that police, at one time, suspected that Mr. Felice committed the crimes, implying that the police now had the wrong person. Brief of Appellant at 23. However, at trial, Appellant presented the testimony of police witnesses who admitted that they had suspected Mr. Felice and had, in fact, followed him undercover for six months. N.T. 10/4/96 at 99–114. Additionally, in his closing argument Appellant's attorney argued that the composite sketch police had obtained of the person carrying the box was similar to Mr. Felice and not Appellant. N.T. 10/7/96 at 31–32. Because the Commonwealth did supply summaries of the activity sheets, it included at least some of the activity sheets, and because Appellant failed to explain how the summaries differed from the activity sheets or how he was prejudiced by not having the activity sheets themselves, we reject Appellant's claim of error.

## Trial Errors

### Admission of Appellant to His Fellow Inmate That Appellant's Neighbor and His Mother Suspected that Appellant Killed Barbara Jean

Appellant posits that the closing argument of the prosecutor during the second trial, where Appellant elected not to testify, impermissibly commented on the silence of Appellant. During closing argument the prosecutor stated, "the defendant admitted to his mother that he killed Barbara Jean and threatened his own mother; there had been no denial of that." N.T. 10/7/96 at 65. Appellant then: (1) cites law that provides that no adverse inference may be taken from a defendant's decision not to testify; and (2) demands a new trial.

The Commonwealth counters by pointing out several important facts that Appellant omitted. First, the prosecutor made her comments in response to the closing arguments of Appellant's attorney. In closing, defense counsel discussed Appellant's statements to Mr. Banachowski. Counsel explained to the jury that:

the prosecutor might argue to you and come to you and say, well, gee, Ladies and Gentlemen, if Walter Ogrod did not tell Jason Banachowski these things that Banachowski testified to, how did he know about Walter Ogrod's mom?

N.T. 10/7/96 at 25. As the trial transcript records, the prosecutor responded:

This defendant and no one else admitted to Jason Banachowski that he killed Barbara Jean Horn. The defendant said that he was beaten up by Chuck because Chuck suspected he did it, **there has been no denial of that.** The defendant admitted to his mother that he killed Barbara Jean and threatened his own mother; **there has been no denial of that.**

*Id.* at 65 (emphasis added). What Appellant did not state in his brief is that his attorney timely objected at trial and the trial court sustained his objection. *Id.* at 65. Subsequently, defense counsel addressed the issue in chambers as follows:

Defense Counsel: Judge, I wanted to put something on the record.

Trial Court: Go ahead.

Defense Counsel: I think Ms. Rubino made a couple of allusions to Mr. Ogrod not denying certain things or there was nothing in contradiction to certain statements that were in the evidence. I think that that is an improper comment on the Fifth Amendment, but **I am not going to ask for a mistrial** because I know that the Court will tell the jury, and I'm asking the Court to tell the jury that the defendant has no obligation to present the testimony.

Trial Court: I've got that on there two or three times.

Defense Counsel: **I've made a tactical decision,** even though Ms. Rubino said that, not to ask for a mistrial because I know that the Court is going to do that and I've conferred with Mr. Ogrod and he agrees.

N.T. 10/7/96 at 69–70 (emphasis added). The Commonwealth submits that because counsel timely objected, made the informed decision not to request a mistrial, and received a curative instruction, Appellant is not entitled to relief.

■ This Court has been reluctant to conclude that comments of this type constitute reversible error, *see generally Commonwealth v. Ross*, 403 Pa. 358, 169 A.2d 780, 787 (1961). Even if it were possible for the jury to draw an improper inference from the comment of the prosecutor, it is clear that the trial court instructed the jury that: it could not consider arguments of counsel as evidence, that Appellant had the right not to testify, and that the jury was not to draw any inference as to what Appellant might have said had he chosen to testify. N.T. 10/7/96 at 72–74. Additionally, the curative instruction promptly followed the objection. Indeed, Appellant's attorney made his closing statement just before a 1:00 P.M. lunch recess and the trial court instructed the jury immediately after the jury returned from that recess. *Id.* at 69–71. The trial court thereby corrected the comment by the prosecutor. *Commonwealth v. Wesley*, 562 Pa. 7, 753 A.2d 204, 209–210 (2000). Where, as here, defense counsel makes a tactical decision (made in consultation with Appellant) that it was in Appellant's interests to have the present jury adjudicate his guilt or innocence, and Appellant receives an appropriate curative instruction, no relief is due outside of an ineffective assistance of counsel claim.

■ Appellant does claim that his trial counsel was ineffective for failing to move for a mistrial when the prosecutor appeared to comment on his silence. "Trial counsel is presumed to have been effective." *Commonwealth v. Fowler*, 550 Pa. 152, 703 A.2d 1027, 1028 (1997).

■ Appellant fails to overcome the presumption that counsel was effective because: (1) the claim lacks arguable merit; (2) defense counsel had a reasonable basis not to move for a mistrial; and (3) because Appellant was not unfairly prejudiced by the comments of the prosecutor. The claim lacks arguable merit because the arguments of the prosecutor did not improperly comment on Appellant's silence. The prosecutor simply stated that Appellant had not denied his own admissions; she did not imply that the jury should infer anything improper from the silence of Appellant. As to

defense counsel's reasonable basis for declining to move for a mistrial, it is clear that defense counsel stated on the record that he was making a tactical decision not to request a mistrial. N.T. 10/7/96 at 70. Defense counsel's decision reflects that he had reason to believe that it was in the best interests of his client to have this jury determine Appellant's guilt or innocence. As defense counsel was present throughout the proceedings and had the opportunity to observe the manner in which the trial was proceeding, we believe his decision to let the case go to the jury was reasonable. Finally, Appellant has also failed to show that his counsel was ineffective because the comment of the prosecutor was insufficient to create a reasonable probability that the result of the trial would have been different.

Appellant also claimed that the trial court violated his Sixth Amendment right of confrontation and the rules of evidence when the prosecutor advised the jury that Mr. Charles Green, the father of Barbara Jean's young friend, suspected that Appellant was the killer. Appellant contends that his trial attorney was ineffective for failing to object to this testimony especially because Mr. Green never testified before the jury. Brief of Appellant at 28.

▆▆▆▆ What Appellant does not disclose is that the only reason the statements were accepted as evidence was that they were the admissions of Appellant to Mr. Banachowski. It was Mr. Banachowski who testified that Appellant made several admissions to him. Mr. Banachowski testified, among other things, that Appellant told him that Mr. Green suspected Appellant and had "hit [Appellant] about it." N.T. 10/7/96 at 55–56. In her closing arguments, the prosecutor referred to the testimony of Mr. Banachowski. She stated:

But, according to what [Appellant] told Mr. Banachowski, he wanted [Barbara Jean] to be found. He didn't want her not to be found, because if she were found, then he could get John Fahy blamed for it, and if he got John blamed for it, John would be out of the picture and in jail. Unfortunately, or fortunately for Mr. Ogrod, I don't know which, John Fahy wasn't blamed for it, and by this point, Walter Ogrod

was probably getting pretty nervous. So, what did he do? He moved out of the house. He moved from Rutland in 1989, the house that belonged to his father, he moved into an apartment when he owned a house. Why was that? Or was it because he was afraid the police were going to be getting closer to him, and because Chuck knew he had done this and now his mother was starting to blame him? What did he tell Mr. Banachowski, his mother said to him, "You and your brother are both nuts, and I think you had something to do with killing that young girl." And what did [Appellant] say to his mother? He said, "that's right, I killed her. And if you know what's best, you'll be quiet." He thought that his mother told the police this, so he said he confessed to save himself, because he thought the police had him.

N.T. 10/7/96 at 59–60. What Appellant objects to as being hearsay and in violation of his confrontation clause rights is nothing more than fully admissible admissions by Appellant to Mr. Banachowski, which counsel for Appellant used and read into the record. N.T. 10/4/96 at 49, 56–57. Indeed, there is no hearsay problem here with regard to what Appellant told Mr. Banachowski about his mother or Mr. Green.[23] There is no expert testimony problem because no one is giving an

---

**23.** However, there may have been a hearsay problem with regard to the statement of Mr. Banachowski that Appellant told him that his mother told Appellant: "You and your brother are both nuts, and I think you had something to do with killing that young girl." This is double hearsay. Double hearsay is permissible if there is a hearsay exception for each statement in the chain. *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406, 417 (1999). That is, Mr. Banachowski can testify as to what Appellant said, but the statement of what the mother purportedly said to Appellant must also meet a hearsay exception. Nevertheless, we cannot fault the prosecutor for referring to a statement that defense counsel presented when he read the complete text of the Banachowski letters into evidence (N.T. 10/4/96 at 31–60) to show that the statements were irreconcilable with the initial confession to Detectives. N.T. 12/20/99 at 12–13, 28, 34. Similarly, we cannot fault defense counsel for attempting to use the statements against one another. However, once defense counsel read the comments into the record so as to use them as a sword, Appellant cannot later be heard to claim that the prosecutor engaged in misconduct by referring to the statements or that defense counsel was ineffective for engaging in a reasonable, but ultimately unsuccessful, strategy.

expert opinion; the witness merely repeated what Appellant told him.

> [V]oluntary extrajudicial statements made by a defendant may be used against a defendant even though they contain no admission of guilt.... These extrajudicial statements, which differ from confessions in that they do not acknowledge all essential elements of a crime, are generally considered to qualify for introduction into evidence under the admission exception to the hearsay rule.

*Commonwealth v. Tervalon*, 463 Pa. 581, 345 A.2d 671, 676 (1975) (citations omitted). There is also no confrontation clause problem because Appellant had the opportunity to cross-examine Mr. Banachowski, the witness testifying against him, with regard to Appellant's statements about his mother and Mr. Green.

The manner in which courts protect against the potential for fabrication of an admission by a witness is through cross-examination. In this case, Mr. Banachowski was the witness the Commonwealth presented against Appellant and Appellant fully exercised his right to cross-examine Mr. Banachowski. N.T. 10/4/96 at 23–78. Thus, the trial court properly allowed the witness to testify as to the admissions of Appellant with regard to Mr. Green and Appellant's mother. As these claims lack arguable merit, any claim of trial counsel ineffectiveness for failing to object to the admissions must fail.[24]

### Fellow Inmate Testified Using an Alias

Appellant next asserts that it was error to permit Jay Wolchanski to testify using an alias, here Jason Banachowski.[25] Appellant argues that the Commonwealth did not want the witness to use his real name because, if he were to do so, the jury might recognize him as a person in the community

---

24. We similarly reject Appellant's claim of prosecutorial misconduct with regard to the prosecutor's comments that there has been no denial that Appellant admitted to his mother that he killed Barbara Jean or that Mr. Green suspected Mr. Ogrod and hit him about it. *Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101, 1109 (1988).

25. For the purposes of our discussion, we refer to the witness as Mr. Banachowski and not Mr. Wolchanski.

who is known to have committed several crimes of deception and to have a reputation as a "jailhouse" or "prison snitch." Brief of Appellant at 25–26. Appellant explains that the reputation of the witness "was so tainted that any citizen of Philadelphia would have recognized the name as the untrustworthy prison informant, known throughout the community as void of any shred of veracity." *Id.* Without citation to authority for the position, Appellant, therefore, asserts that Mr. Banachowski should not have been allowed to use an alias because the pseudonym improperly obscured his true reputation from the jury.

However, Appellant has failed to advise this Court of the reason the trial court decided to allow the witness to testify using an alias. The Commonwealth explains that it requested and the trial court permitted the witness to testify using another name because it was necessary to protect the safety of the witness and his family. N.T. 9/30/96 at 44. During a pretrial hearing, the Commonwealth informed the trial court that the witness was in custody in the Philadelphia area and that his fellow inmates would learn from the Philadelphia newspapers if the witness testified using his real name and would cause him injury. *Id.* at 36, 64. The concern of the Commonwealth was not an idle one. A year earlier, prisoners attacked the witness when they learned that he had testified in another unrelated case. *Id.* at 46.

Additionally, the trial court allowed Appellant to cross-examine the witness fully. Counsel for Appellant, in fact, cross-examined the witness with regard to: his past crimes; what he stood to gain by testifying for the Commonwealth; and his drug and alcohol problems. N.T. 10/4/96 at 25. Appellant also challenged each word that the witness attributed to Appellant, questioning whether the witness recorded the statements verbatim and whether he used his own words. *See, e.g.,* N.T. 10/4/96 at 50–51.

Appellant claims that the trial court caused him prejudice by allowing the use of an alias because, if the witness were allowed to have testified using his own name, the jury

would have known his reputation in the community and rejected his testimony based upon that out-of-court knowledge. We cannot accept this argument. First, we have rules of evidence and *voir dire* of jurors to ensure that the jurors base their decision only upon the evidence presented in the courtroom. Appellant is essentially claiming that the jury should have been entitled to have access to information about a witness that originated outside of the courtroom. Additionally, because the trial court permitted full cross-examination of the witness, Appellant suffered no prejudice. Although Appellant may be correct in stating that, had the witness testified using his own name some of the jurors might have known about the reputation of the witness, allowing cross-examination afforded Appellant the opportunity to inform all the jurors of the reasons why the witness was not to be trusted. Therefore, Appellant did not have to rely on what the jurors may or may not have known about the witness before they came into the courtroom because Appellant had the opportunity to inform them in court of what he deemed important.

Furthermore, the charge the trial court read to the jury made it very clear that it could consider the informer's prior convictions and allow the jury to know if he had anything to gain for his testimony. N.T. 10/7/96 at 89.

I charge you now on an informer's testimony. In judging the credibility of Jason Banachowski, who at one time was a resident in the same penal institution in which the defendant resided, you may consider his status as an informer. An informer is one who voluntarily gives information to law enforcement personnel before being interviewed by them. He is a person who secretly accuses or who gives evidence against another person, often for a reward. The law is that when a witness is an informer, you also must consider whether he is acting out of self-interest and what, if any, reward or benefit he may expect for voluntarily supplying information to law enforcement personnel and for testifying. Also, in judging the credibility of Mr. Banachowski, you may consider his convictions for crimes of dishonesty, theft, forgery, attempted burglary and burglary.

*Id.* Thus, even if the decision of the trial court to permit the witness to use an alias was in error, which we do not believe, Appellant suffered no prejudice from the decision because the trial court permitted Appellant to fully cross-examine the witness with regard to matters concerning the credibility of the witness and charged the jury accordingly.

## Appellant Claims that the Use of an Informant Violated his Sixth Amendment Rights

Appellant also claims that his counsel was ineffective when he failed to move to suppress the statements of Mr. Banachowski based on the position that the Commonwealth violated Appellant's right to counsel. Brief of Appellant at 79–80. Specifically, Appellant claims that "the jailhouse informer had testified on several occasions on behalf of the prosecution ... [and that] the prosecution knowingly circumvented the defendant's Sixth Amendment right to counsel by having an understanding between the police and the informant that information provided by the informant would be rewarded at the informant's sentencing proceeding." *Id.* at 80.

Appellant correctly points out that the Commonwealth cannot circumvent a defendant's Sixth Amendment right to counsel by sending in an informant to question the defendant in circumstances where police could not do so themselves without the presence of an attorney for the defendant. *Commonwealth v. Franciscus,* 551 Pa. 376, 710 A.2d 1112 (1998). However, where a prisoner volunteers his complicity in criminal activity to a fellow inmate, he does so at his own peril. Indeed, " 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached'.... [A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (quoting *U.S. v. Henry,* 447 U.S. 264, 277, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (Powell, J. concurring)). A voluntary

jailhouse admission to a fellow inmate is not subject to any more protection than a confession made by the defendant outside of his jail cell to another person willing to notify authorities.

 Notwithstanding that Appellant alleges a conspiracy, his brief utterly fails to supply any specific evidence except for the fact that the witness has previously testified against other inmates and received a sentence of three years and four months plus three years of probation for his three attempted burglaries and parole violations. Appellant had a full opportunity to examine all the witnesses that could have supplied evidence of the purported conspiracy. However, he cites no evidence that the Commonwealth arranged for the witness to be placed near Appellant to question him. Appellant asserts that the witness had an understanding with the police that the witness would be rewarded at the witness' sentencing hearing if he testified against Appellant. However, there is no evidence of any understanding or benefit conferred upon the witness in exchange for his testimony. Other evidence indicates that there was no preconceived plan because Mr. Banachowski had difficulty contacting authorities. In fact, Mr. Banachowski first wrote a letter to an Assistant District Attorney in January of 1995, but received no reply. It was not until later that year when Mr. Banachowski wrote the second letter to District Attorney Lynne Abraham, in which he explained that he was disgusted with the violent acts Appellant claimed to have perpetrated against Barbara Jean, that the Commonwealth contacted him.

All evidence leads to the conclusion that the witness testified against Appellant because the witness was disgusted with Appellant and was concerned for the safety of other children because the witness himself had a young daughter. N.T. 10/4/96 at 23. These facts differ markedly with those involved in *Franciscus*, the case upon which Appellant relies, where the confession was stricken because: (1) police admitted that they made payments into the informant's prison account; (2) police provided the informant with the home phone number of one of the officers; (3) the informant testified that he was working on

the case with authorities; and (4) no fewer than four State Troopers testified on behalf of the informant at his sentencing hearing. *Id.* at 1114–1115. Because Appellant wholly fails to present facts, which, if known to his trial attorney, would have made it reasonable for the attorney to have moved to suppress the testimony, this claim of ineffective assistance of counsel must fail.

 Defense counsel also testified at the post-sentencing hearing as to why he did not object to the testimony of Mr. Banachowski and that his strategy at the second trial was to show the inconsistencies between Appellant's statement to the police and the purported statement to his fellow inmate. N.T. 12/20/99 at 12–13, 28, 34. Counsel testified:

> My judgment was that the two statements were inconsistent, mutually inconsistent and, therefore, my argument to the jury was that the Commonwealth couldn't prove its case beyond a reasonable doubt because the jury had to pick and choose between which statement to believe.

*Id.* at 13. Therefore, counsel for Appellant made a strategic decision to challenge the statements by pitting one statement against the other to show that they were inconsistent and not to be believed. Because the strategy did not succeed does not make counsel ineffective. Consequently, counsel's decision not to move to suppress the statement was reasonable because: (1) there does not appear to have been a legal basis for the motion; and, (2) counsel used the statement for the purpose of showing that it was inconsistent with Appellant's previous statement. Because counsel's decision was reasonable under the circumstances, it cannot form the basis for a finding of ineffective assistance of counsel. *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890, 895–896 (1999).

### The Commonwealth Referred to Appellant's Statement to Police as a Confession

At trial, the Commonwealth presented a chart that showed a chronology of the events of the case. The chart contained one entry that listed the date of Appellant's confession to police. Appellant objected at trial on the ground that the

statement to police should not be labeled a confession because Appellant asserts that it was involuntary. He further posits that calling the statement a confession impinges on the role of the jury.

Appellant's argument that his statement should not be referred to as a confession is absurd. Webster defines "confession" as "a statement of guilt or obligation in a matter pertaining to oneself." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 475 (16th ed.1971). Appellant told police that he had sexually assaulted Barbara Jean and killed her with a pull down bar. N.T. 10/3/96 at 62–65. It would be hard to conceive of a statement that more clearly fits the definition of confession. As Judge Stout stated when she overruled the objection of Appellant:

> Well, he says he never intended to do anything bad to this little girl. Then he described in detail what he did, hitting her in the head and everything else. So, if that is not a confession, I don't know what is.

N.T. 10/3/96 at 6–7. Deciding whether to admit the chart into evidence was a decision trusted to the sound discretion of the trial court. We will not overturn its decision absent an abuse of discretion. *Commonwealth v. Wharton*, 530 Pa. 127, 607 A.2d 710 (1992). There was no abuse of discretion with regard to this issue.

### Identity Instruction

Appellant avers that the trial court failed to charge the jury with regard to the defense of mistaken identity. Brief of Appellant at 32–34. Appellant requested that the court advise the jury that:

> The defendant may present evidence that someone else committed the crime for which he stands accused. Such evidence is relevant and must be considered by you in determining whether the Commonwealth has proved the defendant guilty beyond a reasonable doubt. Such evidence can itself or with other evidence from the defense and/or the prosecution raise a reasonable doubt of the defendant's

guilt. Remember, that the defendant does not have the burden of proving that some one else committed the crime for which he stands accused. Moreover, even if you believe that the defendant is wrong in his identity of the person he believes committed the crime, you may not find the defendant guilty unless the Commonwealth has convinced you beyond a reasonable doubt of his guilt. The burden always remains with the Commonwealth to prove the defendant guilty beyond a reasonable doubt. In sum, evidence presented by the defense that some one else possibly committed the crime can, by itself, or with other corroborative evidence, from either side create a reasonable doubt of the defendant's guilt.

*Id.* at 33. The trial court read a charge consistent with the requirements of *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied,* 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954). The trial court explained that when there is reason to question the certainty of identification testimony, the jury must consider that evidence with caution. Specifically, the trial court charged the jury with regard to identity as follows:

I charge you now with the law of identity. Where the opportunity for positive identification is good, and the witness is positive in his identification, and his identification is not weakened by prior failure to identify but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with caution. On the other hand, where the witness is not in a position to clearly observe the assailant or he is not positive as to identity, or his positive statements as to identity are weakened by qualifications or by failure to identify the assailant on one or more occasions, the testimony as to identity must be received by you, the jury, with caution.

Credibility of witnesses and the weight to be given them in their identification testimony is exclusively for you, the jury.

N.T. 10/7/96 at 84–85. As Appellant concedes, a trial court is not required to instruct the jury, verbatim, with all requested instructions, even if the substantive law within the proposed

charge is without error. *Commonwealth v. McComb*, 462 Pa. 504, 341 A.2d 496 (1975). The trial court is merely required to explain clearly and accurately the law to the jury; the court is not required to use the form requested by a party. *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181, 1196 (1996).

We examine the charge in its entirety to determine if it accurately and fairly sets forth the law to the jury. *Commonwealth v. Faulkner*, 528 Pa. 57, 595 A.2d 28 (1991), *cert. denied* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). This charge clearly advised the jury that identification testimony is not sacrosanct and that it should be received with caution where it is qualified or weakened through cross-examination or a failure to identify the witness on occasion. N.T. 10/7/96 at 84–85. Although the *Kloiber* charge by the court did alert the jury to its duty to receive equivocal identification testimony with caution, this is not directly applicable to Appellant's claim, which concerned identification evidence tending to suggest that another person—namely, Ross Felice—committed the crime. We note, however, that Appellant does not cite any authority to support the position that the Court was required to give the instruction he requested. In its general instruction on the requirement that a conviction be based upon proof of guilt beyond a reasonable doubt, moreover, the judge charged the jury that "[a] reasonable doubt must fairly arise out of the evidence that was presented, or out of the lack of evidence with respect to some element of the crime." N.T. 10/6/1996 at 92. By indicating that a reasonable doubt could arise out of affirmative "evidence that was presented," this charge fairly subsumed Appellant's proof that someone else may have committed the offense. Accordingly, Appellant is not entitled to relief on this issue.

### Child Pornography References

Appellant claims that the prosecutor made "repeated remarks concerning the defendant and child pornography" notwithstanding that the Commonwealth did not present any evidence concerning whether Appellant had a proclivity for child pornography. Brief of Appellant at 30. Appellant ar-

gues that the references prejudiced him, were more prejudicial than probative of any relevant purpose, and implicitly avers that the references had the "unavoidable effect" of preventing the jury from rendering a true verdict. *Jones,* 683 A.2d at 1199.

Appellant fails to provide references to locations in the transcript where the prosecutor made these "repeated" statements. Additionally, Appellant does not set forth precisely what he claims the prosecutor said that was inappropriate. Pennsylvania Rules of Appellate Procedure 2119(c) and 2132 require an Appellant who makes an argument based on the record to provide "immediately" a reference to the page within "the record where the matter referred to appears." Pa.R.A.P. 2119(c). "References in the briefs to parts of the record appearing in a reproduced record filed with the brief of the appellant shall be to the pages in the reproduced record where those parts appear." Pa.R.A.P. 2132. Appellant has entirely failed to comply with these provisions.

It is equally incorrect, however, for the Commonwealth to state that the prosecutor did not make any such references or to imply that defense counsel admitted that the prosecutor made no such statements. What defense counsel actually said during the post-sentence motion hearing was that while he did not have a specific recollection of the comments, he said that the prosecutor "may well have" made comments regarding child pornography. N.T. 12/20/99 at 30.

From our independent review of the record, two things are clear: (1) there was evidence in the record regarding Appellant and pornography and that Appellant was sexually aroused by children; and (2) the prosecutor did refer to child pornography in her closing statement despite being directed not to do so. We begin with the record. On direct examination, Mr. Banachowski testified that Appellant enjoyed pornography, was aroused by young virgins, and did not date adult women. The prosecutor asked Mr. Banachowski, "did he ever tell you why he would want to molest and kill a four-year-old?" Mr. Banachowski responded, "he says he likes young virgins." The prosecutor then asked, "did he ever say he had dated any

adult women?" Mr. Banachowski responded, "No. His plea-sure was porno shops." N.T. 10/4/96 at 11.

On cross-examination, the attorney for Appellant reviewed the letter Mr. Banachowski sent to the District Attorney line by line in an attempt to show that Mr. Banachowski used his own words and not the words of Appellant; however, the strategy caused additional evidence of Appellant's desire for children to come into evidence. The transcript reads:

Q. [continuing reading the letter, counsel for Appellant asked] ". . . he was aroused by the thought of sex with Barbara Jean and he would masturbate thinking of sex with her." And he said that, right?

A. Right.

Q. "He admits not having sex with adult women, but enjoys sex with young virgins, because they have a sexuality at a young age, and because they are untouched by anyone." And he told you that; is that right?

A. Right.

Q. "He says that he loves them and that all men do, but they don't admit to this. . . . He says that he masturbates here two or three times a day thinking of young virgins or the nurses and guards. He says that he became aroused by the thoughts of young virgin girls or full-figured women." Is that what that says?

A. Right.

*Id.* at 57–58.

■ Notwithstanding that the court had ruled that the references to child pornography were not admissible (*Id.* at 105, 108) in her closing argument, the prosecutor referred to child pornography in a rhetorical fashion.[26] She first remind-ed the jury of Appellant's statement to his fellow inmate that Appellant believed that his mother suspected that he mur-

**26.** "[I]n order to evaluate whether the comments were improper, we do not look at the comments in a vacuum; rather we must look at them in the context in which they were made." *Commonwealth v. Weiss,* 565 Pa. 504, 776 A.2d 958, 968 (2001), *cert. denied,* 535 U.S. 1101, 122 S.Ct. 2303, 152 L.Ed.2d 1059 (2002).

dered Barbara Jean. N.T. 10/7/96 at 60. The prosecutor then said:

> What did he tell Mr. Banachowski, his mother said to him, "You and your brother are both nuts, and I think you had something to do with killing that young girl." And what did he say to his mother? He said, "that's right, I killed her. And if you know what's best, you'll be quiet." He thought that his mother told the police this, so he said he confessed to save himself, because he thought the police had him. They told him, according to him, that they had a witness, and he said to himself, well, that must be my mother.

*Id.* Then the prosecutor asked rhetorically, if Appellant did not tell his mother that he killed Barbara Jean, "why would you tell somebody you did, and if your mother suspected you, why was that? Was it because you're that kind of person? Did she know he was a pervert? Did she know that he had never dated? Did she know he liked going to sex shops and porn shops and have child pornography around?" N.T. 10/7/96 at 60–61. Defense counsel objected, which objection the trial court sustained. *Id.*

The standard for granting a new trial because of the comments of a prosecutor is a high one. *Jones,* 683 A.2d at 1199. "Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict." *Id.* This standard permits us to grant a new trial based on the comments of a prosecutor only if the unavoidable effect of the comments prevented the jury from considering the evidence. A prosecutor must have "reasonable latitude in fairly presenting a case to the jury and must be free to present his or her arguments with logical force and vigor." *Commonwealth v. Brown,* 551 Pa. 465, 711 A.2d 444, 454 (1998).

In the instant case, the prosecutor asked the jurors to ask themselves why it was that Appellant confessed to the

police, and she asked them about his admission to his mother, as told by Mr. Banachowski. To make sure that the jury did not believe that Appellant made no statement about his mother the prosecutor questioned how it was, if Appellant did not tell his mother that he killed Barbara Jean, that his mother suspected him. All these questions were appropriate. However, the prosecutor acted inappropriately by posing some of the answers to the question of why his mother suspected him if he had not told her and suggesting that the answer might be that he liked child pornography when she had been directed not to discuss that. Defense counsel correctly objected and the trial court correctly sustained the objection. N.T. 10/7/96 at 61. The trial court also cautioned the jury that the closing statements were not evidence and that they should guide the jury only "insofar as they are supported by the evidence and appeal to [the jury's] reason and judgment." *Id.* at 72. Although the comments of the prosecutor were inappropriate, they did not rise to the level that would have the "inevitable effect [of] ... prevent[ing the jury] from properly weighing the evidence and rendering a true verdict." *Jones*, 683 A.2d at 1199. Therefore, we decline to grant Appellant a new trial and reject his claims of ineffectiveness of trial counsel with regard to the comments of the prosecutor.

## Photographs

Appellant next contends that, during trial, the prosecutor improperly presented photographs that depicted children's clothing and stuffed animals in an attempt to evoke passion and emotion against Appellant. The Commonwealth responds that it introduced fifty-six photographs at trial and that Appellant fails to: (1) identify which ones were allegedly improper; or (2) cite to the portion of the record where the contested photographs were introduced.

As we stated in the previous section, Pennsylvania Rules of Appellate Procedure 2119(c) and 2132 require an Appellant who makes an argument based on the record to provide "immediately" a reference to the page within "the record where the matter referred to appears." Pa.R.A.P. 2119(c).

Again, Appellant has failed to reference the portion of the record where the prosecution presented the photographs he claims are offending, nor does Appellant provide copies of the photographs or state whether his attorney objected to them. Obviously, it is difficult to review such an amorphous claim.

However, we do understand that Appellant asserts that the unidentified pictures that depicted children's clothing and stuffed-animals were irrelevant and inflamed the passions of the jury against him. Relevance as well as the admissibility of photographic material are matters trusted to the sound discretion of the trial court. *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 726 (1998), *cert. denied*, 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999). Because Appellant has failed to identify the photographs, we are not inclined to replace our judgment with that of the trial court. Moreover, even if the trial court's relevance decision was in error, any prejudice Appellant may have suffered was *de minimis* and was insignificant compared to the evidence of guilt. *Commonwealth v. Moore*, 534 Pa. 527, 633 A.2d 1119, 1128 (1993) *cert. denied*, 513 U.S. 1114, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995).[27] Because the photographs were properly admitted, we reject Appellant's arguments that: (1) the admission of the photographs entitled him to a new trial; (2) his trial counsel was ineffective for purportedly failing to object to the photographs; and (3) the prosecutor engaged in misconduct by presenting them.

## Trial Counsel Failed to Call Character Witnesses

Appellant argues that his trial counsel was ineffective in failing to present the character testimony provided at Appel-

**27.** The Commonwealth relies on cases in which courts have been called upon to determine whether the presentation of photographs depicting murder victims was too inflammatory. The Commonwealth implies that because we have held that some graphic pictures of murder victims could be presented to juries, that photographs of teddy bears and the clothing of children may not be excluded. This argument misconstrues the evidentiary requirement. The standard is one of relevance and of balancing probative value against the possibility of unfair prejudice. If a photograph is not relevant or is unfairly prejudicial, it is not admissible, regardless of the presence or absence of a dead body.

lant's first trial. Appellant reasons that the failure of his counsel to call character witnesses was without reasonable basis and, therefore, ineffective.

The Commonwealth counters by pointing-out that, "[a] failure to call a witness is not *per se* ineffective assistance of counsel for such decision usually involves matters of trial strategy." *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1319 (1996). Indeed, in this case it appears that defense counsel in the second trial studied the first trial and believed that Appellant's case was harmed when he presented character testimony because the prosecutor was able to respond with testimony that Appellant had a reputation as not being law-abiding. N.T. 10/29/93 at 951–960. During the post-sentence motion hearing, defense counsel explained that he did not present character evidence at the second trial because he wanted to prevent the prosecution from presenting contrary evidence. N.T. 12/20/99 at 27–28. Defense counsel testified as follows:

Q. During the first trial, you submitted and produced several people to testify as to the defendant's good character; isn't that correct?

A. That's correct.

Q. During the second trial, you produced no good character testimony; isn't that correct?

A. That is also true.

Q. Was there a rational or reasonable basis, what was your basis for failing to produce any character witnesses?

A. During the cross-examination of the character witnesses, Mr. Casey brought up specific acts of conduct that were—was designed to impeach the accuracy of the character witnesses' testimony; and based upon that impeachment, **I did not want to open the door a second time to Miss Rubino (the prosecutor) impeaching the character witnesses with other acts of misconduct on the part of Mr. Ogrod which would have nullified the impact of the character testimony.**

N.T. 12/20/99 at 27–28 (emphasis added). Because it is clear that defense counsel had a reasonable strategic basis for not calling character witnesses at the second trial, counsel was not ineffective by failing to call the witnesses. *Porter,* 728 A.2d at 895–896.

### Trial Counsel Did Not Call Witnesses to Testify that Appellant was Sleep Deprived

Appellant claims that his trial counsel was ineffective for failing to call several witnesses who would have testified that Appellant was sleep-deprived and ego-weak and that, therefore, his confession to police was not voluntary. Brief of Appellant at 70. Appellant further contends that there was no reasonable basis to have called these witnesses at the first trial but not to call them at the second trial. *Id.* The Commonwealth responds by pointing out that the decision not to call a witness is not ineffective assistance of counsel where counsel had reasonable basis for his decision. *Auker,* 681 A.2d at 1319.

At the post-sentence motion hearing, Appellant's trial attorney testified that his trial strategy at the second trial was necessarily different from that at the first trial because the Commonwealth had obtained a second confession from Appellant. N.T. 12/20/99 at 32–34. Because of the second confession and the fact that Appellant decided not to testify at the second trial, defense counsel and Appellant agreed that they should not call the witnesses. *Id.* at 32–33. The testimony on this issue follows:

A ... the presentation at the first trial was that he was really, really tired before—when he went down to the Police Administration, based upon the fact that he had worked like a 12–or 16–hour shift—

Q. I see.

A. —the night before.

Q. So that all of these witnesses dealt with his activity with reference to the inference that he was too tired to make a truthful and voluntary statement?

A. That's correct.

Q. Okay. Now, you called them in the first trial?

A. Yes.

Q. And not in the second trial?

A. Well, their testimony went hand in glove with Walter then following them and testifying in front of the jury at the first trial. I think the stage was set by having these witnesses testify about Walter and what kind of worker he was and then describing that he was working, I think, until 5:00 a.m. or 6:00 a.m. that morning, that he then went down to the police station in response to a note that the detectives had left on his door. And so it just segued into him going in and testifying at the first trial, I went down there, I was exhausted, they kept me down there, I didn't know what I was saying. But the dynamic changed at the second trial where Walter was not going to testify, number one; and, number two, the theory was playing one statement off against the other.

*Id.* at 32–33. The record, therefore, demonstrates that defense counsel made a reasoned decision not to call the witnesses at the second trial: (1) because he planned to play one confession off another; and (2) because Appellant decided not to testify at the second trial. The decision of defense counsel not to call witnesses to testify to Appellant being sleep deprived or weak-willed was a strategic one that does not provide a basis on which to grant a new trial.

### Penalty Phase Hearing Claims of Error

The penalty phase took place on October 9, 1996. At the hearing, the Commonwealth incorporated the record from the guilt phase of the trial in support of the alleged aggravating circumstance that the killing of Barbara Jean occurred during the felony of attempted involuntary deviate sexual intercourse. N.T. 10/9/96 at 8; *see* 42 Pa.C.S. § 9711(d)(6).

As mitigating circumstances, Appellant argued that: (1) he had no significant history of prior criminal convictions; (2) he

was under the influence of extreme mental or emotional disturbance at the time of the killing; and, (3) that there was other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense (the catchall mitigator). Pursuant to the catchall mitigator, Appellant asserted that: he was emotionally disturbed at the time of the killing; he suffered from childhood abuse that affected his emotional and psychological development; and he attempted to better himself through his life by seeing a psychiatrist, enlisting in the Army Reserves and learning to drive a truck. N.T. 10/9/96 at 5–6; *see* 42 Pa.C.S. § 9711(e)(1), (4), (8).

At the penalty hearing, Dr. Peter David Ganime, M.D. (Dr. Ganime), a psychiatrist, Father John Bonavitacola (Father Bonavitacola), the prison Chaplain, and Appellant testified in support of the mitigating circumstances. Dr. Ganime testified that he first met Appellant when Appellant was eleven-years-old, at which time his mother sought to have him committed to the hospital that employed Dr. Ganime. N.T. 10/9/96 at 12. Notwithstanding that, Appellant was not displaying any disruptive behavior; the hospital admitted him because employees were concerned about the safety of Appellant due to the erratic behavior of his mother. *Id.* Indeed, Dr. Ganime later learned that the mother had a prior history of several psychiatric hospitalizations and a history of excessively litigious behavior. *Id.* at 14. Dr. Ganime testified that Appellant's parents were in the midst of a custody battle for Appellant at the time Dr. Ganime met him. *Id.* at 13. Dr. Ganime met with the father and mother of Appellant. The father appeared stable, but the assessment of Dr. Ganime of the mother was less favorable. She missed appointments and the doctor testified that he:

> began to suspect that she herself might have a rather serious mental illness.... She made numerous statements regarding the boy, which, in my opinion, did not appear to be logical. She declared, for example, that she wanted the boy put away in an institution. When [Dr. Ganime] questioned her as to why, she declared that she feared that if the

boy went home to live with the father, quote, I might run into him some day and he might try to kill me, end quote. *Id.* at 20. Dr. Ganime testified that Appellant did not have a major mental illness but "showed evidence of minimal brain dysfunction syndrome of childhood and also that he appeared to be an ego-defective child[.] [The doctor] also suspected that [Appellant] may have been the recipient of rather severe psychological and possible physical abuse." *Id.* at 19, 33. Upon discharge from the hospital, a court placed Appellant in the care of his father, and Dr. Ganime recommended outpatient treatment.

Dr. Ganime intermittently continued to see Appellant. When Appellant was seventeen years old he expressed a desire to join the Army Reserves, which Dr. Ganime supported by submitting a letter of recommendation in which he stated that he thought that Appellant would make "a fine soldier." *Id.* at 35. However, while in basic training, Appellant could not get along with other soldiers and after a short time, he had to be hospitalized, after which the Army discharged him. *Id.* at 24–35.

Appellant also presented the testimony of Father Bonavitacola, who testified that life in prison for a convicted child-killer is difficult. Father Bonavitacola also stated that while in prison, Appellant had been a gentleman to the Father and got along with the guards. However, there were several occasions when Appellant got in fights with other inmates, but Appellant held his own. N.T. 10/9/96 at 47–49.

At the penalty hearing, Appellant testified on his own behalf. He told the jury that he was greatly affected by his mother taking him from his father at age five. His mother claimed Appellant was crazy and repeatedly removed him from schools. Appellant claimed that he did not know or understand what was going on or why things were happening. *Id.* at 52. Appellant said that his mother physically abused him and his brother, but his relationship with his father was normal. *Id.* at 53–54. When his father got sick with diabetes, Appellant took care of him by driving him to receive dialysis

treatment, giving him shots of insulin and reading to him. *Id.* at 56. Appellant said that he joined the military, but had difficulty with basic training and had difficulties getting along with others. He got in several fights, spent time in the military hospital, where he was examined by psychiatrists, and was eventually discharged. *Id.* at 57. He estimated that his entire length of service was a few months. *Id.* at 63. He told the jury that he held several jobs, went to school, and got his truck-driving license, driving for three delivery companies, the last for a two-year period up until his arrest in 1992. *Id.* at 57–61. The parties stipulated that Appellant had no previous criminal record.

The jury found one aggravating circumstance—that the murder was committed during the perpetration of a felony— and no mitigating circumstances. The jury set the penalty at death.

### Victim Impact

Appellant asserts that during the penalty phase, the prosecution improperly presented victim impact testimony and referenced the impact of the crime on the family of Barbara Jean notwithstanding that the crime occurred approximately five months before the effective date of the statute that authorized the use of victim impact testimony. *See* 42 Pa.C.S. § 9711. Appellant reasons that because the statute "applies only to sentences imposed for offenses that took place on or after its effective date[,]" it was error for the trial court to have permitted the presentation of victim impact testimony or to allow the prosecutor to comment on the effect of the crime on the victim's family. Brief of Appellant at 37 (citing *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130, 145, n. 7 (1996)).

First, we address the issue of whether the Commonwealth presented victim impact testimony and then we turn to the comments of the prosecutor. It appears from the record that the prosecutor did not present any victim impact testimony at the penalty hearing and merely incorporated by reference the testimony from the guilt phase to show the aggravator. N.T. 10/9/96 at 8. Because the Commonwealth did not

present victim impact testimony, the argument of Appellant that he was prejudiced by such testimony lacks merit.

With regard to comments by the prosecutor, Appellant alleges that victim impact testimony was used. The Commonwealth admits that the prosecutor, in her closing, noted that Appellant did not show any sympathy for the family of Barbara Jean. However, the Commonwealth claims that the comments of the prosecutor merely rebutted the testimony Appellant presented at the penalty hearing. Brief of the Commonwealth at 56. At the hearing, the prosecutor pointed out that Appellant did not express any remorse for what Barbara Jean and her family went through. N.T. 10/9/96 at 85. She stated that the claim of Appellant, that prison was sufficient punishment for his crime because, as a convicted child killer, he would be the lowest of the prison hierarchy, demonstrates that he only cared about how he has suffered, but did not consider what the child and her family went through. N.T. 10/9/96 at 61–62.

In *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288, 301 (1983), we recognized that a single statement about lack of remorse was not a basis for granting a new sentencing hearing. We noted that "[h]ad the prosecutor launched an extended tirade on this point, thereby focusing undue attention on the remorse factor, [the defendant's] claim of prejudice might have greater force." *Id.* In the instant case, the prosecutor's comments were limited. As we stated previously, the comments of a prosecutor will not entitle a defendant to a new sentencing hearing unless:

the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Ligons,* 565 Pa. 417, 773 A.2d 1231, 1238 (2001), *cert. denied,* 537 U.S. 827, 123 S.Ct. 122, 154 L.Ed.2d 40 (2002) (quotations and citations omitted). Indeed, in *Ligons,* we declined to grant a new trial notwithstanding that the prosecutor rejected the defendant's testimony that he had a difficult life and argued that the case was really about the

victim and that, because of the murder, the victim would not be able to be with his children or his family. *Id.* In *Ligons,* the prosecutor stated:

What you heard today revolved around one person, the defendant. You heard nothing about Clarence Johnson [the victim] today but you must remember that that this case really is about Clarence Johnson and the fact that he did not have opportunities to be with his family, to be with his children, to be with his wife, mother, brothers, sister, after this incident.

*Id.*

In this case, Appellant also presented detailed evidence about how difficult his life was. He did not say he was sorry for what the family of Barbara Jean went through. At the close of her statement to the jury at the end of the penalty phase, the prosecutor noted that the killing of Barbara Jean harmed more than just the victim; it hurt her family and her community. Specifically, the prosecutor stated:

We submit to you, Ladies and Gentlemen, that this man deserves the ultimate penalty. Not because we do not like him, but because of the kind of person he is, just the kind of person his mom ... saw in him so many years ago when he was 11, when she tried to have him hospitalized because she thought he might kill her.

Well, he did kill. It wasn't the mother, but he did kill, and he killed not just Barbara Jean, but her entire family and the entire community.

N.T. 10/9/96 at 87. "A prosecutor is permitted wide latitude in making arguments to the jury." *Commonwealth v. Marshall,* 534 Pa. 488, 633 A.2d 1100, 1107 (1993). "[W]hile a closing argument must be based upon evidence in the record or reasonable inferences therefrom, a prosecutor is permitted to respond to defense evidence and engage in oratorical flair. Indeed, greater latitude in presenting argument is afforded during a penalty phase, as the presumption of innocence is no longer applicable." *Ligons,* 773 A.2d at 1238 (quotations and citations omitted). The brief comments of the prosecutor in

this case were made in response to the attempts of Appellant to make the jury feel sympathy for him, and did not prevent the jury from weighing the evidence and rendering a true verdict. *Id.* Accordingly, the comments of the prosecutor do not entitle Appellant to a new sentencing hearing.

 Appellant also claims that his attorney was ineffective for failing to object to the statements of the prosecutor during her closing. To rebut the presumption that counsel is effective, a defendant must demonstrate: "(1) that the underlying claim is of arguable merit; (2) that counsel's performance was unreasonable; and, (3) that counsel's ineffectiveness prejudiced [him]." *Commonwealth v. Edmiston,* 535 Pa. 210, 634 A.2d 1078, 1092 (1993). Because we have determined that the claims of Appellant lack merit and would not have altered the result of the penalty hearing, the ineffective assistance of counsel claim must also fail.

## Age of the Victim Was Not an Aggravating Circumstance

 Appellant asserts that the prosecution argued that the jury should consider the age of the victim as an aggravator. Brief of Appellant at 34–36, 52–55. Although the prosecution requested that the trial court allow it to prove the age aggravator, the court denied the request and the Commonwealth proceeded with only one aggravator: that the killing occurred during the commission of a felony. Both the prosecution and Appellant referred to the facts of the case. The jury convicted Appellant of the killing a four-year-old girl. It would be inappropriate to prohibit the prosecution from stating that fact. Because the court prohibited the use of the age aggravator, which it determined was not yet in effect, and the prosecution did not seek to prove the aggravator, this argument does not warrant granting Appellant a new sentencing hearing.[28]

---

**28.** The claim of Appellant of ineffective assistance of counsel for failing to object must similarly fail because the underlying claim lacks arguable merit. Additionally, because we have determined no age aggravator was presented to the jury, Appellant's claim of prosecutorial misconduct with regard to this issue must also fail.

### Cross-examination of Appellant During Penalty Hearing

Appellant avers that, during the cross-examination of Appellant at the penalty phase, the prosecutor was permitted to ask questions beyond the scope of the direct examination of Appellant. Specifically, Appellant argues that the prosecutor should not have asked him whether or not Appellant dated; whether or not Appellant got along with people in his neighborhood; how the Green family came to live in his house; whether or not Appellant's father gave him his house; and whether or not Appellant was handing out circulars for his employer's business on the date of the murder.

Although a defendant is entitled to testify and present witnesses to prove the mitigating circumstances, the Commonwealth is also entitled to cross-examine those witnesses and the defendant if he testifies, to establish whether they are to be believed. As we have explained:

Following the presentation of evidence, counsel are permitted to argue to the sentencing body for or against the death sentence.

It is apparent from the structure provided that this evidentiary hearing is intended to serve as part of the "truth-determining process" to enable the sentencer to discern and apply the facts bearing on the determination of the appropriate sentence. Implicit in the fact that the statute assigns to the defendant the burden of proving mitigating circumstances by a preponderance of evidence is the understanding that the jury is to assess the evidence for credibility. It must be left open for the Commonwealth to challenge the veracity of facts asserted and the credibility of the person asserting those facts, whether that person is a witness or the defendant.

*Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846, 857–858 (1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990). At the penalty hearing, Appellant presented the testimony of Dr. Ganime, who stated, among other things, that Appellant "had difficulties with peer relationships, difficulties in school, difficulties in working." N.T. 10/9/96 at

32. The doctor attributed these problems to the psychologically unstable nature of Appellant's mother who repeatedly attempted to institutionalize Appellant until his father obtained custody, after which Appellant had only limited contact with his mother. On cross-examination, the prosecutor asked Dr. Ganime whether his relationship with his mother would have made him hate women. The doctor responded that he did "not think that Walter expressed any strong feelings like that. He talked more about [that] he didn't trust women, he was afraid that if he married, he would marry a woman like his mother, and that he would go through the same troubles his father went through." *Id.* at 40. Then the prosecutor asked whether Appellant had ever dated. Dr. Ganime responded affirmatively and stated that he "had some relationships with women." *Id.* Appellant was not prejudiced by this testimony, which was a fair comment on the evidence presented on direct examination.

The prosecutor also asked Appellant whether he had dated and Appellant responded that he had. *Id.* at 69. This question was a reasonable follow-up on the testimony of Appellant and his psychiatrist that Appellant had difficulties in peer relationships and in no way did it prejudice Appellant for the jury to hear that he had dated women. Similarly, there was no error when the prosecutor asked Appellant whether or not Appellant got along with people in his neighborhood; how the Green family came to live in his house; and whether or not Appellant's father gave him his house. As to the question of whether or not Appellant was handing out circulars on the date of the murder, Appellant's attorney timely objected and the court sustained the objection before Appellant answered. *Id.* at 74. Appellant suffered no prejudice there.

Appellant argues that many of the statements of the prosecutor in closing were attempts to prove non-statutory aggravators. We disagree. None of the statements demonstrate that the prosecutor sought to prove non-statutory aggravators and, thus, Appellant is not entitled to a new sentencing hearing. It is also clear from the record that the Commonwealth only sought to prove one aggravator, that the

492

murder was committed during the commission of a felony, and the trial court only charged the jury with that aggravator. N.T. 10/9/96 at 98. The prosecutor did not seek to prove that Appellant tortured the victim as an aggravator; she merely described the act of repeatedly hitting a child on the head with a metal object, as torture. This comment falls within the rhetorical latitude afforded to prosecutors. This statement does not rise to the level of attempting to prove an aggravator or prosecutorial misconduct.[29]

The prosecution is entitled to discuss the evidence Appellant has presented to the jury and to comment fairly on it. *Commonwealth v. Marshall*, 534 Pa. 488, 633 A.2d 1100 (1993). The following statements Appellant complains of were fair comments on the testimony Appellant and his witnesses presented during the penalty hearing because Appellant did present testimony consistent with the statements of the prosecutor that: the mother of Appellant was afraid of him (N.T. 10/9/96 at 20); other prisoners don't like Appellant (*Id.* at 61); the mother of Appellant tried to have Appellant put away years ago because she was afraid he might try to kill her (*Id.* at 17, 20); he did not get along with his neighbor (*Id.* at 70); he did not get along with his roommate (*Id.* at 43, 71); he didn't like his dog (*Id.* at 44); and, from the time he was little he fought (*Id.* at 18, 47–48, 66–67).

Appellant presented testimony designed to gain sympathy with the jury. The prosecution responded by pointing out that Appellant did not apologize and cited to the facts of the case that included evidence that Appellant was not remorseful at the time of the crime because he returned home and masturbated. Despite the fact that this statement was somewhat inflammatory, it accurately described the facts of the case and the prosecutor was entitled to refer to them. *Commonwealth v. Abu–Jamal*, 555 A.2d at 858.

29. The claim of Appellant of ineffective assistance of counsel for failing to object to the comment of the prosecutor must similarly fail because the underlying claim lacks arguable merit.

■■■ Appellant also argues that the prosecutor committed misconduct by stating that the jury should not think more of Appellant than the people in jail, whom Appellant indicated thought he occupied the lowest rung in the prison hierarchy because of the nature of his crime. Appellant also objects to the following statement of the prosecutor that responded to the argument of Appellant that life in prison would be hell for him: "if he doesn't like the life in prison, then maybe he shouldn't have committed the crime. If he doesn't like life in prison, well, we can take care of that and he won't have to do it." N.T. 10/9/96 at 85–86. While the statements are hardly dispassionate ones, we have repeatedly stated that a prosecutor is entitled to engage in rhetorical flair and "must have reasonable latitude in fairly presenting a case to the jury and must be free to present his or her arguments with logical force and vigor." *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444, 454 (1998). The conduct of the prosecutor falls within the "reasonable latitude" that is accorded prosecutors in making their closing arguments and clearly does not have "the unavoidable effect ... [of] ... prejudic[ing] the jury, [and] ... prevent[ing] them from properly weighing the evidence and rendering a true verdict." *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181, 1199 (1996). Therefore, the comments do not warrant the grant of a new sentencing hearing, nor do they constitute prosecutorial misconduct.

### Penalty Phase Charge to Jury

At the close of the penalty phase, the trial court charged the jury with its responsibilities during deliberation surrounding penalty issues. Appellant argues that the charge of the trial court was in error for six independent reasons, each of which Appellant contends entitles him to a new sentencing hearing. We address each claim in turn.

### A. Appellant Claims That The Trial Court Erred By Failing To *Sua Sponte* Advise The Jury That A Life Sentence Means Life Without Parole

■■■ Appellant alleges that the trial court erred by not advising the jury that a defendant sentenced to life may not be

494

paroled. Appellant is only entitled to a *Simmons* instruction when the prosecution argues that Appellant is a future danger to the community. *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). "A *Simmons* instruction is required to be given only in those cases where the future dangerousness of the defendant is at issue in the penalty phase." *Commonwealth v. Chester*, 557 Pa. 358, 733 A.2d 1242, 1257 (1999). In this case, however, the prosecutor did not argue that Appellant would be a future danger to the public. Consequently, this claim lacks merit.

## B. Appellant Claims That The Trial Court Erred By Improperly Correcting An Error In The Record.

Appellant claims that the trial transcript shows that the trial judge improperly charged the jury with its duty to find aggravating circumstances unanimously. Appellant also argues that the Commonwealth should not have been allowed to correct an error in the trial court transcript. Appellant points out that the trial transcript originally read as follows:

After considering any unanimous aggravating circumstances and as many mitigating circumstances as you individually may find, if you decide at least one aggravating circumstance and no mitigating circumstances exist, or if you **are unable to** find that one or more aggravating circumstances outweigh any mitigating circumstances, the verdict must be death. In all other cases, the verdict must be a sentence of life imprisonment.

Brief of Appellant at 40 (emphasis added). However, after a hearing on the issue and listening to the testimony of the stenographer, who testified that the trial court actually said "unanimously" instead of "are unable to[,]" the trial court ordered the transcript amended to read as follows:

After considering any unanimous aggravating circumstances and as many mitigating circumstances as you individually may find, if you decide at least one aggravating circumstance and no mitigating circumstances exist, or if you **unanimously [are unable to]** find that one or more aggravating circumstances outweigh any mitigating circum-

stances, the verdict must be death. In all other cases, the verdict must be a sentence of life imprisonment.

N.T. 10/9/96 at 97; 5/25/00 at 36 (emphasis added). Because the charge, as given to the jury, properly instructed the jury on its responsibilities pursuant to 42 Pa.C.S. § 9711(c)(1)(iv), this claim of trial court error does not entitle Appellant to a new sentencing hearing.

■■■ Appellant also asserts that the procedure used by the prosecution to correct the record was improper. Pennsylvania Rule of Criminal Procedure 115(C) and Pennsylvania Rule of Appellate Procedure 1926 permit the trial court to conduct a hearing to determine whether a record should be corrected and authorize the correction in the event that an error occurred. Rule 115(C) provides "[a]t any time before an appeal is taken the court may correct or modify the record in the same manner as provided by Rule 1926 of the Pennsylvania Rules of Appellate Procedure." Rule 1926 provides, in pertinent part, "if any difference arises as to whether the record truly discloses what occurred in the lower court, the difference shall be submitted to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth." In this case, the trial court conducted a hearing to determine the true content of the record and had the benefit of listening to the testimony of the stenographer, who testified that the trial judge properly used the word unanimously, but that the stenographer had mistakenly transcribed the word. N.T. 5/25/00 at 6–15. The trial court, thereby, properly applied the statute and corrected the transcript. *Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441, 450 (1997), *cert. denied,* 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998).

We also reject Appellant's claim of trial counsel ineffectiveness for failing to object to a proper charge. Similarly, the claim of Appellant that he received ineffective assistance of counsel due counsel's failure to argue that the charge did not properly explain the verdict slip is not meritorious because the actual charge the judge read to the jury was correct.

## C. Appellant Claims That The Trial Court Improperly Instructed The Jury On Mitigation Evidence.

Appellant argues that the trial court should have given a curative instruction to the jury because, he contends, the prosecutor led the jury to believe that it could only consider the mitigating circumstances of extreme mental or emotional disturbance and diminished capacity (42 Pa.C.S. § 9711(e)(3) and (4)) and not other mental and emotional factors relevant to the catchall mitigator. 42 Pa.C.S. § 9711(e)(8). The prosecutor did no such thing. The prosecutor merely pointed out that Dr. Ganime, the psychiatrist who testified on behalf of Appellant, did not state that Appellant suffered from a severe mental illness. He agreed with the prosecutor that Appellant was not suffering from a major mental illness because he did not have schizophrenia, bipolar disorder, or another major depressive disorder. N.T. 10/9/96 at 33, 80–82. As to mental or emotional disturbance, the prosecutor accurately referred to the testimony when she stated:

> Did you hear anything that amounts to extreme mental or emotional disturbance? What you heard is that the defendant was concerned about money, he was concerned about where he was going to live, he was concerned about his job, same kind of things that we're all concerned about. He wasn't seeing a psychiatrist because he had any major mental illness, he was seeing a doctor so he would have somebody to talk to when he felt like talking and to get some advice.

*Id.* at 80. With regard to the catchall mitigator and the claim of Appellant that his emotional distress should be deemed to satisfy it, the prosecutor did not say that Appellant had to be suffering from major mental illness for the jury to consider the claim of Appellant that his alleged emotional disturbance satisfied the catchall. She merely pointed out that "he was not emotionally disturbed at the time of the killing [and] that there has been no such diagnosis that he suffered from childhood abuse that affected his emotional and psychological development." N.T. 10/9/96 at 98–100. Significantly, the trial

court instructed the jury that it must consider the catchall mitigator and that it could consider the emotional and mental condition of Appellant there. The trial court charged the jury that it:

> may consider any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense, and under that the defendant submitted three items: Number 1, the defendant was emotionally disturbed at the time of the killing ... 2, the defendant suffered from childhood abuse that affected his emotional and psychological development; and, 3, the defendant has attempted to better himself through life either by seeing a psychiatrist to deal with his emotional problems or by attempting to join the Army Reserves or working at various jobs to support himself.

*Id.* at 99–100. Clearly, the trial court charged the jury that it could consider emotional disturbance as a mitigating factor pursuant to the catchall provision. The statements of the prosecutor were appropriate and the trial court read to the jury a proper instruction. For similar reasons, the claim of Appellant that his attorney was ineffective for failing to object to the proper instruction and to the statements of the prosecutor is baseless because the underlying claim is not meritorious.

**D. Appellant Claims That The Trial Court Erred By Failing To Define The Elements Of The Underlying Felony Of Attempted Involuntary Deviate Sexual Intercourse.**

Appellant claims that the sentence of death must be set aside because the trial court, when charging the jury with the aggravator of committing murder during the perpetration of a felony, did not repeat the elements of the underlying felony, which it had read to the jury during the guilt phase. Because the same jury found, during the guilt phase, that Appellant had committed the felony of attempted involuntary deviate sexual intercourse, there is no reason for it to reconsider that issue during the penalty phase. At the penalty phase, the jury must determine whether Appellant commit-

ted the murder during the commission of a felony, not whether Appellant committed the felony. There was simply no reason to re-instruct the jury to find facts it has already resolved. *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575, 585 (1991). The claim of Appellant that his attorney was ineffective for failing to insist that the jury be charged with the elements of the underlying offense is baseless because the underlying claim is not meritorious.[30]

### E. Appellant Claims That The Trial Court Erred By Giving The Jury An Anti–Sympathy Charge.

Appellant next submits that some unidentified portion of the charge the trial court read to the jury was "constitutionally infirm" because it "precluded any finding of mercy even arising out of the evidence." Brief of Appellant at 77. The trial court properly charged the jury with the law. The jury was instructed to consider the mitigating factors set forth in 42 Pa.C.S. § 9711(e). The trial court also acted to protect Appellant from prejudice by charging the jury that it "should not decide the penalty out of any feelings of vengeance or prejudice against the defendant." N.T. 10/9/96 at 97. The charge did not inhibit the jury from the consideration of the evidence or finding that the evidence warranted a finding that Appellant did not deserve to receive the death penalty.[31]

30. Appellant also contends that his trial counsel was ineffective and the prosecutor committed misconduct because trial counsel failed to object when the prosecutor, in her closing statement during the penalty phase, argued to the jury that, "the aggravating circumstance is what you already found, that this [the killing] occurred during the commission of the attempted involuntary deviate sexual intercourse of a four-year-old child [, a felony]." N.T. 10/9/96 at 79. The prosecutor's argument does not rise to the level of misconduct, nor is there anything ineffective in trial counsel's failure to object to the statement. A prosecutor is given reasonable latitude in presenting his or her version of the case to the jury. *Commonwealth v. Bullock*, 384 Pa.Super. 269, 558 A.2d 535, 539 (1989). Here an objection of counsel would not have been likely to have been sustained and even if the statement were objectionable, it would not warrant a finding of prosecutorial misconduct. *Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101, 1109 (1988).

31. The claim of Appellant of ineffective assistance of counsel for purportedly giving an anti-sympathy charge must also fail because no such charge was given.

**F. Appellant Claims That The Verdict Slip Was Constitutionally Defective.**

▮ Appellant avers that the verdict slip violated *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), because it purportedly did not advise jurors that: any one of them could find a mitigating circumstance; the finding of the existence of mitigating circumstances need not be unanimous; and any mitigating circumstance found by any one juror could outweigh the aggravating circumstances. We disagree. The trial court properly charged the jury that:

your findings as to mitigating circumstances do not need to be unanimous. Each of you is free to regard a particular mitigating circumstance as present, despite what other jurors may believe. A defendant must have the full benefit of any mitigating circumstance, and each juror is permitted to consider and to give effect to mitigating evidence when deciding the ultimate question, whether to vote for a sentence of life or death. After considering any unanimous aggravating circumstances and as many mitigating circumstances as you individually may find, if you decide at least one aggravating circumstance and no mitigating circumstances exist, or if you unanimously find that one or more aggravating circumstances outweigh any mitigating circumstances, the verdict must be death. In all other cases, the verdict must be a sentence of life imprisonment. If you do not agree on one or the other of these findings, a sentence of life must be imposed.

N.T. 10/9/96 at 97. Because the trial court made it clear that any one juror could find the existence of a mitigating circumstance and that any mitigating circumstances could outweigh aggravating circumstances, this claim of error and its accompanying claim of ineffective assistance of counsel are without merit and do not entitle Appellant to a new sentencing hearing.

### Scope of Proper Rebuttal of Mitigation Evidence

▮ Appellant claims that the manner in which the prosecution rebutted the mitigation evidence of Appellant

violated his due process rights. It is true that if the prosecution were permitted to present evidence that was unduly prejudicial such that it would prevent the jury from rendering a true verdict, a new sentencing hearing would be appropriate. *Ligons*, 773 A.2d at 1238. However, the cross-examination and closing statement of the prosecution during the sentencing hearing were well within evidentiary and constitutional limits. It bears repeating that:

> [i]mplicit in the fact that the statute assigns to the defendant the burden of proving mitigation circumstances by a preponderance of evidence is the understanding that the jury is to assess the evidence for credibility. It must be left open for the Commonwealth to challenge the veracity of facts asserted and the credibility of the person asserting those facts, whether that person is a witness or the defendant.

*Commonwealth v. Abu–Jamal*, 555 A.2d at 858. The Commonwealth properly challenged the mitigation evidence of Appellant. Certainly, the cross-examination or closing statement of the prosecutor did not improperly prejudice Appellant. *Jones*, 683 A.2d at 1199.

### Joint Call to Prison Regarding the Dosage of Appellant's Medication

Appellant asserts that he is entitled to an evidentiary hearing to determine whether the prosecutor directed prison officials to change Appellant's medication so that he did not appear to be so subdued as to be incapable of committing the crime. No such hearing is warranted. Apparently, both the prosecutor and Appellant made calls to prison officials. The prosecutor merely observed that at the first trial Appellant appeared to be overmedicated. Trial counsel for the defendant testified at the post-sentence hearing that the level of medication was "not a factor in determining whether the defendant should or should not testify[.]" N.T. 12/20/99 at 40–41. Additionally, defense counsel admitted that he believed that "Mr. Ogrod was receiving his medication consistent with good medical practice and that it was not designed in order to

make him appeared [sic] to be less than competent." *Id.* Thus, this claim and the associated ineffective assistance of counsel claim lack merit.

## Proportionality Review

Although Appellant filed his notice of appeal in June of 2000 and the parties submitted the case to this Court on April 9, 2002, Appellant appeals from his October 8, 1996 conviction and November 8, 1996 death sentence and is, therefore, entitled to proportionality review. Specifically, proportionality review was required because the trial court imposed the Judgment of Sentence on Appellant before the June 25, 1997 effective date of the repeal of proportionality review.[32]

> Consistent with decisions of the United States Supreme Court, prior decisions of this Court, and the sentencing statute, this Court will conduct an independent evaluation of all cases decided since the effective date of the sentencing procedures under consideration (September 13, 1978). This review will utilize all available judicial resources and will encompass all similar cases, taking into consideration both the circumstances of the crime and the character and record of the defendant in order to determine whether the sentence of death is excessive or disproportionate to the circumstances.

*Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288, 303 (1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984) (citations and quotations omitted). We have also described our proportionality review as follows:

> When we conduct our [proportionality] review, we examine not only the compiled data from the AOPC ["Administrative Office of Pennsylvania Courts"], but we also have at our disposal the verdict sheets and the review forms submitted by the President Judges. This allows us to conduct a thorough review of cases similar to the one in question and provides additional screening for any anomalies that may be present in the AOPC database.

**32.** See note 17 *supra.*

502

■ *Harris,* 703 A.2d at 451–452 (quoting *Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426, 441 (1997), *cert. denied,* 525 U.S. 1005, 119 S.Ct. 519, 142 L.Ed.2d 430 (1998)). We have conducted a proportionality review in this case and have determined that the sentence of death was not disproportionate to the penalties imposed in similar cases.

### Conclusion

The sentencing statute at the time of Appellant's trial directed that:

The Supreme Court shall affirm a sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3). Because the sentence of death was not the product of passion, prejudice or any other arbitrary factor, because there was sufficient evidence to support the aggravating circumstance, and because the sentence was not disproportionate, we affirm the judgment of sentence and the determinations of guilt. Pursuant to 42 Pa.C.S. § 9711(i), we direct the Prothonotary of the Supreme Court of Pennsylvania to transmit, within ninety days, the complete record of this case to the Governor of Pennsylvania.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

Justice NIGRO files a concurring opinion.

Justice SAYLOR concurs in the result.

### *CONCURRING OPINION*

Justice NIGRO.

I am constrained to join the result reached by the majority despite the fact that the jury failed to find the mitigating

circumstance that Appellant had no significant history of prior criminal convictions under 42 Pa.C.S. § 9711(e)(1), even though the parties *stipulated* to the fact that Appellant had *no* criminal history. Of course, had Appellant properly raised an issue regarding the jury's failure to find the existence of this mitigator, he would be entitled to relief under the law as it stands today. *See Commonwealth v. Rizzuto,* 566 Pa. 40, 777 A.2d 1069, 1089 (2001) (where a mitigating circumstance is presented to the jury by stipulation, the jury is required by law to find that mitigating factor). I recognize, however, that Appellant did not raise this issue here, and that the law was in a different state at the time of his trial. *See Commonwealth v. Copenhefer,* 526 Pa. 555, 587 A.2d 1353, 1360 (1991) (trial court not required to charge the jury that defendant's lack of prior record constituted a mitigating circumstance as a matter of law).

Thus, because Appellant does not raise an issue regarding the jury's failure to find his lack of criminal history as a mitigating circumstance, and because he would not be entitled to relief on any claim of ineffective assistance of counsel raised under the PCRA, *see Commonwealth v. Carpenter,* 555 Pa. 434, 725 A.2d 154, 166 (1999) (counsel cannot be deemed ineffective for failing to predict a change in the law), I am constrained to join the result reached by the majority.[1]

---

1. Appellant also argues that the trial court erred by not giving the jury a *Simmons* instruction. While I recognize that a majority of this Court has found that a defendant is only entitled to a *Simmons* instruction when the issue of his future dangerousness has been raised, I merely take this opportunity to reiterate my position that there should be a *Simmons* instruction in all capital cases, regardless of whether the issue of the defendant's future dangerousness has been raised. *See, e.g., Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31 (1998) (Nigro, J., concurring); *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344 (1998) (Nigro, J., concurring).